# FREEMAN, NOOTER & GINSBERG
### ATTORNEYS AT LAW

LOUIS M. FREEMAN
THOMAS H. NOOTER*
LEE A. GINSBERG

30 VESEY STREET
SUITE 100
NEW YORK, N.Y. 10007

*NY AND CALIF. BARS

(212) 608-0808
(212) 962-9696 (FAX)

November 30, 2009

Via ECF – without attachments
Via First Class Mail – with attachments

Honorable Raymond J. Dearie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re: <u>United States v. Thiruthanikan Thanigasalam</u>
06 Cr. 615 (RJD)**

Dear Judge Dearie:

The sentencing of Thiruthanikan Thanigasalam ("Thani") arises not only from a long and difficult legal path before this court but also, and perhaps in a more historical and overarching way, from a long and difficult life struggle beginning with the persecution of Mr. Thanigasalam's family and ultimately the murder of Thani's father, by the very organization of which he now stands convicted of aiding. No summary analysis or peripatetic attempt at describing the path that led to Thani's arrest and guilty plea could adequately describe all the reasons that have led to the instant sentencing process. In addition, instead of placing before the court a subjective, advocate driven description of the complex political and cultural history of the

Page 1 of 9

Tamil people, counsel has chosen to provide the court with what we hope may be seen as neutral and factually accurate articles from internet web sites that describe the History of the Sri Lankan Civil War and its roots. (Exhibit A). An article from www.encyclopedia.com (an affiliate of the Associated Press) is also presented to the court to demonstrate the level of desperation embodied in many Tamils in Sri Lanka and abroad, particularly those whose lives have been deeply affected by living through the horrors of constant threats of torture, displacement, refugee camps, military servitude, murder, family separation, asylum and the lifelong trauma and nightmares of that history. (Exhibit B). The particulars relating to Thani's personal and family history are set out below.

The court is fully familiar with the background of this case, including issues regarding the constitutionality of the charged statutes and potential defenses, all of which required legal briefing.  Arguments and affidavits prepared by counsel have been submitted to the court during the pendency of this action which serves to further provide the court with an in depth view of the charged conduct.  In addition, the government has effectively submitted its entire direct trial case to the court by way of pre-sentence memoranda that have included exhibits ranging from material seized from a co-defendant's apartment and computer, to intercepted telephone conversations, and a videotape of the meeting set up by a government informant. For his part, the defendant does not contest that the material submitted by the government existed, that the recordings are accurate and that he traveled to the United States, at the behest of his co-defendant, to meet with individuals whom he believed were weapons dealers. Finally, as the court is aware, since this was a "sting" operation, no weapons were transferred or sold and no money was exchanged.

The challenges that the defendant does make herein are to what we respectfully suggest are double or multiple counting of guideline enhancements and the over representation of the criminal history category as required by U.S.S.G. Section 4A1.3(b). To be clear, we do not challenge the offense conduct or the underlying documents submitted by the government in support thereof.

### MULTIPLE COUNTING OF ENHANCEMENTS

The offense level computation in the PSR suggests that for Counts 2 and 3 the adjusted offense level is 42. This level is reached by utilizing a base offense level of 26 and adding 2 points pursuant to U.S.S.G Section 2M5.3(b)(1), 12 points pursuant to U.S.S.G. Section 3A1.4(a) and 2 points pursuant to U.S.S.G. 3C1.1. (The defendant does not take issue with the last enhancement). The base offense level is derived by cross-referencing the statutes charged with the appropriate guideline section. Here, the statute, as well as the actual conduct charged, incorporates the concepts of the use of violence and the commission of a "federal crime of terrorism". The statutory language specifically prohibits the provision of material support to a foreign terrorist organization. That support, in this case, involved the conspiracy to purchase, or attempted purchase, of weapons, including missiles. This enhancement therefore, almost duplicates the base offense level conduct, which already provided 20 points of the calculation. Therefore, the enhancement under section 3A1.4(a) should not be applied because adding those points, involving violence and terrorism, double counts the same conduct contemplated in the base offense level.

Likewise, the computation for Counts 4 and 5 begins with a base offense level of 20 which is enhanced by 4 points pursuant to U.S.S.G Section 2K2.1(b)(1)(B), 4 points pursuant to U.S.S.G. Section 2K2.1(b)(3)(A), 12 points pursuant to U.S.S.G. Section 3A1.4(a) and 2 points

Page 3 of 9

pursuant to U.S.S.G. Section 3C1.1. Once again, the base offense level incorporates conduct that is added in the enhancements except for the final addition of 2 points for Obstruction of Justice. The enhancement under Section 3A1.4(a) is akin to a restatement of the conduct prohibited by the statute. A federal crime of terrorism is effectively a federal felony that transcends national boundaries and involves violence, including death or the risk of death. This enhancement therefore, essentially duplicates the base offense level conduct, which already adds 20 points to the calculation.

### OVER REPRESENTATION OF THE DEFENDANT'S CRIMINAL HISTORY

Pursuant to Section 4A1.4(b) the defendant's Criminal History Category is calculated at VI notwithstanding the fact that Mr. Thanigasalam has no prior arrests. This category adjustment arises, no doubt, from the recognition that a crime involving federal terrorism should be enhanced both vertically and horizontally, under the guidelines. While the upward adjustment of the Criminal History Category is supported by the sentencing guidelines, the court still retains discretion to depart from category VI by either adjusting it to a lower category or by sentencing the defendant below the appropriate guideline as determined by the court, as long as the sentence is calculated at or above the 25 year mandatory minimum required by statute. While this case differs substantially from *United States v. Meskini,* 319 F.3d 88 (2d Cir. 2003), in which a criminal history departure was granted from an otherwise enhanced criminal history category, it falls within the category of cases in which the court retains discretion to do so. We respectfully suggest that based upon Mr. Thanigasalam's lack of prior record and the social history provided below, he should be in Criminal History Category I.

## **SUFFICIENT BUT NOT GREATER THAN NECESSARY**

Unless the court determines that the sentencing guideline applicable in this case is below the 25 year mandatory minimum we respectfully argue, that for the reasons set forth below, a sentence below the applicable guideline, but not less than the 25 year mandatory minimum, is more than sufficient punishment to be meted out to Mr. Thanigasalam.

On the day of his arrest, Thani was a 41-year-old man who had long been a productive member of his community, who had achieved high levels of competence in school and at work, who was married for more than ten years and was the father of a young daughter, with another child on the way. At the time of his sentencing he will have been in custody for more than forty months and, even if the court imposes the mandatory minimum sentence, he will be more than sixty years old when he is released. He has already missed the birth of his son and he will not be able to be with his children until they are adults. Perhaps more painful, because of an administrative decision by an agent of either the Department of Justice and/or Homeland Security, his wife and children have been barred from entering the United States to visit him since November 2008. While predicting the future actions of these agencies is difficult, it may well be that Mr. Thanigasalam will be separated from his family for many more years to come.

As the PSR indicates, verification of much of the personal history regarding Mr. Thanigasalam was difficult because, at least initially, the Probation Officer was only able to have one brief telephone conversation with his wife. In a separate letter, with additional attachments comprised of personal letters and documents supporting Mr. Thanigasalam's exemplary background and difficult path to Canada, we will corroborate much of that history. We respectfully suggest that the court not discount any of the positive social history aspects of his life because they were not verified earlier on in the sentencing process. Furthermore, we suggest

that due to the nature of charges in the case, as well as the actions in preventing visits from his family, there was reluctance on behalf of friends and family to provide what would normally be typical background information.

Mr. Thanigasalam's life path has not been an easy one. When he was a young adult in Sri Lanka, the Sri Lankan civil war came into full bloom. While tensions between the Sinhalese majority and the Tamil minority existed as early as the 1800's, the slowing simmering antagonism's boiled over in the mid-1980's. By the time these events began to envelop the country, Thani had already demonstrated that was an outstanding student and responsible son. He had begun to matriculate in a local college but because of the danger from both the Sri Lankan majority Sinhalese government (aided at the time by the Indian government) and the Tamil Tigers ("LTTE"), continuing his education became more than problematic. On many occasions he was taken into custody by one side or the other and beaten and interrogated because of his believed sympathy for either the government forces or the "LTTE" forces. (Exhibit C – "Claim to Convention Refugee Status"). Thani and other family members were frequently forcibly removed from their home and, on numerous occasions, ended up in temporary refugee camps because of the danger in their community or because it was politically expedient. The camps were frequently crowded, unsanitary, and minimally supplied.

Eventually Thani's house was destroyed and his father was murdered because he refused to support the LTTE financially, or otherwise. On that particular day, Thani's father refused to give soldiers his truck so they detained him, brought him to another location where he was beaten and then shot eight times. Nonetheless, the soldiers took the vehicle anyway. Thani has always been reluctant to discuss the traumatic details of his father's murder, because, in addition to the brutality of the act itself, he was called to the location of the murder so that he could

Page 6 of 9

witness his father lying on the ground dead, covered in blood.  There are no words that this writer can summon to describe what Thani went through at the time and how it has impacted his entire life.

While the episodes of being captured, tortured and released occurred on a regular basis, some are more memorable than others. As detailed in his refugee application, at one point Thani was strung upside down while electric shocks were applied to his body; this treatment was continued until he passed out. While Thani knows that this occurred on more than one occasion, he cannot, or does not want to, recount each event. A number of the incidents are recorded in more detail the refugee claim attached hereto.

At some point prior to his father's death, it was decided that Thani's sister should be sent to Germany where there were other relatives and where she would be safe from the violence, including the rapes of many young women.  Thani was not sent to another country because he was a young man, and because it was not so easily accomplished. Having stayed behind and witnessed his father's death, Thani then effectively became homeless, as his house was destroyed and he was shuttled around to various relatives and camps, along with his mother. At one juncture, with not much left to lose in Thani's view, he confronted the local LTTE militia and demanded the return of his father's vehicle.  Unfazed by Thani's brashness, an officer of the LTTE pointed a pistol at his head and threatened him by stating, "do you know what happened to your father?"  The soldier "advised" Thani to leave the country.  Almost immediately thereafter, recognizing that he would be murdered next, Thani fled his home territory in the north of Sri Lanka in order to try to escape abroad. As further detailed in the refugee filings, he eventually was able to escape to India, the United States and then Canada. In 1991, a year after he made his

claim for refugee/asylum status, Thani's claim was granted. Eventually, both his mother and sister were able to immigrate to Canada, where he resided with them until his arrest.

Thani began his life again once he was in Canada. He was required to attend high school there, although he had already graduated from the same level of school in Sri Lanka. He then went on to college and obtained an engineering degree (Exhibit D). During the time he was in college he tutored other Tamil students and he continued that volunteer work throughout his years in Canada. He married in 1997 and, as earlier reported, he now has two children. Immediately after graduating from college he obtained employment and he has been continually employed since then, at more significant positions and higher pay scales based on his abilities and character.  As many letters attesting to the respect in which Thani is held and corroborating his work and educational background arrived on the date this submission was due, we will submit a supplemental letter with additional attachments.

### It Is Unlikely That Thani Will Recidivate

Thani is now a 43-year-old man who had never been arrested prior to his involvement in the instant case.  If sentenced to the mandatory minimum of 25 years, he will be in his sixties when he is released.  Studies show that older inmates are less likely to recidivate.  See "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines" available at: http://www.ussc.gov/publicat/Recidivism_General.pdf.

In addition, Thani has a strong work ethic, excellent skills, a good education and a strong support network of family and friends.  He and his family have been devastated, emotionally and financially, by his crime and incarceration and this will remain with them forever.  These factors make it highly unlikely that he will engage in illegal conduct in the future.  See generally *United States v. Hamilton*, 323 Fed. Appx. 27 (2d Cir 2009)(district court's failure to consider age-

recidivism correlation constitutes sentencing error); *United States v. Lucania*, 379 F.Supp.2d 288 (E.D.N.Y.2005)(the Guidelines also do not take into account the inverse relationship between age and recidivism).

## **CONCLUSION**

We do not argue here that the crimes for which Mr. Thanigasalam has pled guilty are anything but serious. Further, we recognize, as we must, that the court has no current recourse other than to impose a sentence no less than 25 years. This court is well aware of the discretion it has under the evolving case law and the statutory considerations in 18 U.S.C. 3553(a), and undoubtedly, by the date of sentence, the court will have received probation reports and sentencing memoranda regarding numerous individuals charged with varying levels of conduct connected to the Tamil Tigers and the Sri Lankan civil war.

We respectfully suggest that in this case, under these circumstances, for this defendant, Thiruthanikan Thanigasalam, twenty-five years in jail is sufficient punishment, yet not greater than necessary. This sentence amply takes into account specific and general deterrence, the serious of the crimes and, also, accounts for the individual characteristics and history of the defendant. While Thani may or may not survive such a lengthy jail term, surely, it cannot be fairly argued that such a sentence is not substantial and in line with other sentences for similar conduct.

Respectfully,

*Lee Ginsberg*

Lee Ginsberg

cc:    AUSA Marshall Miller (Via ECF without attachments; Via First Class Mail with attachments)