# LAW OFFICES OF BOBBI C. STERNHEIM

212-243-1100 • Main
917-306-6666 • Cell
888-587-4737 • Fax

156 Fifth Avenue - Suite 823
New York, NY 10010
bcsternheim@mac.com

November 30, 2009

*Via ECF (without attachments)*
*Via Express Mail (with attachments)*

Honorable Raymond J. Dearie
Chief United States District Judge
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11210

Re: <u>United States v. Sahilal Sabaratnam</u>
<u>06 Cr. 615 (RJD)</u>

Dear Judge Dearie:

    This sentencing memorandum and the annexed letters are respectfully submitted on behalf of Sahilal Sabaratnam ("Sahil") and set forth factors that the Court should consider in determining what sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a). For the reasons set forth below, it is respectfully suggested that a downward departure based on aberrant behavior is warranted. It is further suggested that in view of Sahil's limited involvement and the fact that he will be subject to a more restrictive sentence due to his lack of U.S. citizenship, a variance from the guideline range is justified. However, in the absence of judicial discretion, it is respectfully requested that the Court impose the mandatory minimum sentence of 25 years, which is greater than necessary to achieve the purposes of sentencing in light of the circumstances of this case and personal characteristics of the defendant.

## Acceptance of Responsibility

    Sahil accepts responsibility for his participation in the offenses of conviction. In an effort to put his participation in context, he met with the government. An earlier desire and intention to plead guilty to charges in the initial indictment (Counts 2 and 3 of the instant superseding indictment) which carried maximum terms of 15 years' imprisonment was foreclosed when, after almost a year-and-a-half from the date of arrest, the government superseded the indictment to include charges which carry a mandatory minimum term of 25 years' imprisonment. This effectively usurped the Court's discretion to fashion a sentence that is sufficient but not greater than necessary.

**Challenges to the Presentence Investigation Report ("PSR")**

Certain statements and calculations within the PSR are in dispute. In discussing Sahil's limited participation, the Probation Department labels him as a "technical weapons expert for the LTTE." PSR ¶18. There is no support for this allegation. The Probation Department also attributes conduct to Sahil - he "discussed the possibility of obtaining night vision goggles, [etc.]" - that is not supported by the video recording of the meeting where such conduct is alleged to have occurred. PSR ¶18. In addition, Sahil disputes the allegation he told agents "he participated in the trip in order to make more money to support his family." PSR ¶17.

The PSR calculates a total offense level of 49 at Criminal History Category IV. This offense level calculation, resulting in a guideline range of life, is tantamount to double if not multiple counting. It substantially overstates the seriousness of the offense and the extent of Sahil's participation. The 25-year mandatory minimum sentence for conspiracy to acquire anti-aircraft missiles and the related attempt charge also incorporate violence, weapons, and terrorism. The base offense level for conspiracy to provide material support to a foreign terrorist organization and the related attempt charge incorporate use of violence and terrorism. Consequently, the proposed enhancements are redundant. In light of the government's proof against Sahil, which the government has indicated is limited to the video-recorded meeting and an earlier non-recorded meeting in a Dunkin Donuts shop, the enhancements are both inappropriate and overly punitive.

Likewise, Criminal History Category IV is a gross overstatement. This offense represents Sahil's only arrest. Category IV bears no relationship to the crime-free history of this defendant. Accordingly, the appropriate Criminal History Category is I.

The Probation Department recommends an overall custodial sentence of 40 years. It recommends concurrent 15-year terms (the statutory maximum) for the material support charges (Counts 2 and 3) and concurrent terms of 30 years (5 years above the 25-year mandatory minimum) for the anti-aircraft missile charges (Counts 4 and 5). A sentence of 40 years far exceeds what is necessary to achieve the purposes of sentencing in light of the factors set forth in 18 U.S.C. 3553 (a). The sentence imposed in this case for this defendant should not exceed the statutory minimum term of 25 years.

**Disparate Treatment**

Sahil's status as a deportable alien subjects him to harsher confinement and more severe restrictions in prison than U.S. citizens. In addition to facing deportation, his status as a deportable alien renders him ineligible for minimum-security designation, community confinement, and other institutional programs, opportunities that are otherwise available to the general prison population. *See, e.g., United States v. Farouil*, 124 F.3d 838 (7th Cir. 1997) (district court is free to consider whether defendant status as a deportable alien would result in unusual or exceptional hardship in conditions of confinement that might warrant a departure (ineligible for home detention, community confinement, work release, intermittent incarceration, or minimum security designation)). *See also, United States v. Navarro-Diaz*, 420 F.3d 581 (6th Cir. 2005)(where district court noted defendant would be punished more than a citizen due to

2

ineligibility for six-months of half-way house near end of term); *United States v. Davoudi*, 172 F.3d 1130 (9th Cir. 1999)(ineligibility for minimum security designation of up to six months of home confinement authorized by 18 U.S.C.§3624(c) can justify departure.)

Moreover, based on the charges of conviction, the Department of Justice and/or Homeland Security has barred family members from entering the United States for the purpose of visiting Sahil. The lack of visitation and family contact is an additional punishment for Sahil, one that may endure throughout the term of his lengthy sentence.

Such disparity between deportable aliens and citizens would be a basis for a variance from the guidelines and would warrant imposition of a sentence outside and below the guideline range. Regrettably, the Court lacks the discretion to impose a sentence below 25 years, one that would take into account the personal circumstances of the defendant, Sahilal Sabaratnam.

## Unwarranted Disparity

Another sentencing directive is the need to avoid unwarranted disparity among defendants with similar records who have been found guilty of similar conduct. The Court need only compare Sahil with the defendants in a similar case prosecuted in the District of Maryland-Baltimore to appreciate unwarranted disparity. *See United States v. Osman, et al.*, 06 Cr. 416 (CCB); *United States v. Rusli and Soedirdja*, 06 Cr. 439 (CCB).

Six people -- four Indonesians, a Singaporean, and a Sri Lankan -- were arrested after U.S. undercover agents trapped them in a sting operation. These defendants had sought to buy 53 military weapons, including sniper rifles, machine guns and grenade launchers as well as ammunition and night-vision devices for the Tamil Tigers. They contacted an undercover business in Maryland to request a price list and negotiate a deal. As the sting unfolded, Singaporean Haniffa Bin Osman met with undercover FBI agents in Baltimore to test-fire weapons and discuss transferring them to Sri Lanka. He provided coordinates for delivering the weapons in the Indian Ocean and asked about the cost of unmanned aerial vehicles. Osman told the agents that if the first order, for some $900,000 worth of supplies went smoothly, a second one worth $15 million could follow. Thereafter, $250,000 was wired from a Malaysian bank to a U.S. bank account set up by the undercover agents as a down payment for the weapons' purchase. Osman then traveled to Guam to inspect the weapons, which included two surface-to-air missiles. Then a second payment of $452,000 dollars was made. Osman was joined in Guam by retired Indonesian general, Erick Wotulo, and they both met with undercover agents to discuss shipping the weapons to Sri Lanka. They were both arrested in Guam.

Sri Lankan Thirunavukarasu Varatharasa pleaded guilty to conspiracy to provide support to a foreign terrorist organization and attempted exportation of arms and munitions and was sentenced to 57 months. Indonesian Haji Subandi pleaded guilty to the conspiracy, money laundering, as well attempted exportation of arms and was sentenced to 37 months. Wotulo and Osman both pleaded guilty to the conspiracy and money laundering. Wotulo was sentenced to 30 months; Osman to 37 months. Two other Indonesians, Reinhard Rusli and Helmi Soedirgja, also pleaded guilty and received 12-month sentences.

Sahil's involvement pales in comparison to the participation of these defendants who were sentenced to a fraction of the time Sahil faces.

**<u>Characteristics of the Defendant</u>**

Sahilal Sabaratnam is 30 years old. This represents his only arrest and conviction. Sahil is the youngest child and only son of Tamil parents who emigrated from Sri Lanka to India with Sahil, age 6-1/2, and his four older sisters. When Sahil was 9, the family emigrated to Toronto, Canada. Sahil has an exemplary educational and employment history. He has maintained legitimate employment throughout high school and college. Following college graduation, Sahil began his career in financial services and advanced to the position of business development associate for TD Waterhouse in Toronto. Prior to this offense, he became engaged and had planned to marry.

The 38 accompanying letters from family, friends and colleagues shed light on Sahil's good character and support the contention that Sahil's participation in the charged offenses constitutes aberrant behavior. Those who have known him personally describe Sahil in the following ways:

- "During these difficult times Sahil was a pillar of great strength and support . . . I am grateful for the compassion that he had provided during a very difficult time of my life. All things considered, I will continue to confidently state that Sahil is a fine, well-balanced person with an abundance of positive qualities." (Exhibit 1)

- "He was a good role model to the young children . . .He also encouraged respect and teamwork among the children. . . His respect for the elderly and care for children truly confirms his good nature… Irrespective of his pending criminal case, I continue to hold Sahil in high character. His actions do not measure up to his outstanding character." (Exhibit 2)

- "In my eyes, he is an exemplary friend because he is honest, supportive and remains true to his morals... I continue to feel that his character is only of excellence." (Exhibit 3)

- "In my humble opinion, the charges against him do not comply with his personality . . . While I understand the severity of the situation, I stand by my statements of Sahil's honorable character." (Exhibit 4)

- "As a member of the community, Sahil has greatly contributed to assisting people in need. . . [L]earning about his criminal charges and recent guilty plea . . . took me by surprise. I have worked together with Sahil and having seen him work on various community issues. I can confidently say he was always respectful of the law. I can vouch with certainly that he is a person of high morals, integrity and social responsibility." (Exhibit 5)

- "[A]ware of the recent situation . . . that Sahil has pleaded guilty to several criminal offenses. . . I stand by my statements and truly believe that Sahil is a kind, honest, and respectful individual and friend." (Exhibit 6)

- "Having witnessed his maturation from a boy into a man, I feel that I can appropriately describe to you Sahil's benevolent nature. . . Sahil's help during the worst time of my life will never be forgotten.. . While I am aware of his recent guilty plea to very serious charges, I continue to uphold my statements of his trustworthy character." (Exhibit 7)

- "As a lifelong friend and family member, I believe I can provide an accurate description of Sahilal's character. Sahilal is a loving, caring, trustworthy, and supportive individual... a well-balanced individual with many positive qualities." (Exhibit 8)

- "He has always been virtuous and supportive of all those he encountered. My family and I have always been trustworthy of Sahilal and believe he is a decent man." (Exhibit 9)

- "As an individual, he exudes a positive and enthusiastic attitude and contributes to a lively environment of trust and respect whether interacting with students, community members or the University administration." (Exhibit 10)

- "I believe that his strength lies in motivating people to do better in life.. . Although this [criminal] situation is shocking to me, I believe that Sahil is an individual of integrity, good merit, and strong morals." (Exhibit 11)

- "I have never seen a person with such social duty as Sahil has revealed. The little things that he contributes to our community, is in my opinion, a rightful expression of his humanity." (Exhibit 12)

- "I certainly feel that this boy is an outstanding citizen . . ." (Exhibit 13)

- "I would say that Sahilal is a fine, well balanced person with an abundance of positive qualities." (Exhibit 14)

- "In essence, I would say that Sahil is a kind hearted person with a positive attitude and one who is extremely helpful to others." (Exhibit 15)

- "I observed nothing but positive character traits in his personality and his actions. These include a profound concern for social justice." (Exhibit 16)

- "I am entirely aware of Sahil's guilty plea. . . I was taken aback by his situation, as it does not epitomize the person I knew. . . I for one, continue to feel that Sahil is an upstanding Canadian citizen with a very bright future. I have no hesitation is vouching for Sahil's excellent moral character." (Exhibit 17)

5

- "He was a great asset to our community and has been actively involved in community affairs for a long time. He had respect and admiration of all who came in contact with him." (Exhibit 18)

- "Although the charges against him are very serious and are things that I myself do not condone, I know that Sahilal is an extraordinarily kind and gentle man with some sort of lapse of judgement." (Exhibit 19)

- "I have observed him in many situations, and he is one individual who cannot walk away from someone who comes to him for help. Irrespective of his guilty plea to serious criminal charges, I thoroughly believe that Sahil is an individual with gracious qualities. He is well known in our community for his beautiful heart and holds a fine reputation with everyone that has crossed his path." (Exhibit 20)

- "I continue to believe Sahilal to be a man of character and integrity. He is someone that is sensitive to the plight of others and has always demonstrated empathy to victims of persecution." (Exhibit 21)

- "Sahil has been well known amongst family, friends and the community for his volunteer work. He was a young man with a very generous heart. . . I understand the implication of his criminal charges and feel that such charges do not reflect correctly on his good character. I continue to trust that Sahil is an exemplary person, who should be given a second chance." (Exhibit 22)

- "When I was at a very young age, my father passed away…It was my uncle [Sahil] who acted as a father figure to me and a responsible individual to my family through this difficult time... My uncle was an active part of my life. . .My uncle provided for me like a father. I value his relationship." (Exhibit 23)

- "After meeting Sahil, my view for love and life became very different. . . He reminded me that mistakes were the lessons that life had to teach now so that, in the future, we could apply what we learned from them. Sahil assured me that moving on with dignity and maintaining decorum of self is what makes a person better in life. Those words have always motivated me to better myself and helped me to become the person I am now. . . Understanding Sahil's guilty plea. . . I continue to stand by my statements of his fine character." (Exhibit 24)

- "I regard Sahil with the utmost respect for his unwavering dedication to his family and friends and consider his compassion toward others an endearing part of his identity. . . I know this [criminal] situation does not reflect well on Sahil; however, it is not at all reflective of the person I have come to know. . .Regardless of the situation, I stand by my friend and my assessment of his character." (Exhibit 25)

- "In the time that I have known Sahil, I have come to respect the responsibilities he has taken on for his family." (Exhibit 26)

6

- "Sahil is an honest, considerate, and supportive friend who was genuinely happy in being part of others' success... Most importantly, I think it is commendable that Sahil has helped others without ever expecting anything in return." (Exhibit 27)

- "[H]e is tolerant and respectful of the world around him... Sahil has positively contributed to our lives and I believe he can further contribute positively to this society." (Exhibit 28)

- "Sahil was an open-minded individual, who promoted extensive community work... He was a compassionate, reliable, and responsible individual with a sincere interest in helping people in need." (Exhibit 29)

- "Sahil's perseverance, humanity, and lively essence have helped me from failing myself and my family. I am grateful to Sahil for helping me reclaim, not only my health, but also my pride..." (Exhibit 30)

- "Understanding the [criminal] issue at hand, I continue to believe that Sahil is an honorable individual with a great sense of respect for life itself." (Exhibit 31)

- "Thus Sahil not only taught soccer to the girls that day, but also helped instill independence and self-esteem. Sahil strived to instill a good foundation for his nieces. The positive image that he presents has been a great influence on our children." (Exhibit 32)

- "[Regarding his girl cousins], Sahil nurtures and guides them fraternally in many aspects and provides them with assistance in academic pursuits and with other undertakings. They perceive him as the brother which they never had." (Exhibit 33)

- "Sahil, in our brief interaction, was very intuitive in recognizing that I was troubled... He was able to put me at ease with his positive outlook on life. During out friendship [Sahil] consistently provided excellent support and was mercifully non-judgmental." (Exhibit 34)

- "Sahil played a supportive role in my life and was more like my brother than my friend... I am indebted to Sahil for his guidance in my life... His guilty plea certainly does not change my opinion of his noble character." (Exhibit 35)

- "I was astounded when I learned of the criminal charges and guilty plea since I have always known Sahil as a highly spiritual individual with established morals in his life. My feelings of Sahil's good character are undeterred by his unfortunate actions." (Exhibit 36)

- "From my interactions and friendship with Sahil, I can confirm that he has good judgment. On numerous occasions, I observed his respect for the law and the manner in which he made well thought out decisions. I have always known his to be a law-abiding citizen, who copied with government authorities." (Exhibit 37)

- "[Regarding Sahil's] plead[ing] guilty to a serious criminal offense, I do not understand it, as it is not in keeping with the person I know and trust. . . I stand by my statement that Sahil is an admirable, honest and helpful friend... [O]ne incident can rarely, if ever, sum up an individual as a whole...as the charges do not comport with the person I know." (Exhibit 38)

As these letters indicate, this regrettable incident is uncharacteristic and totally aberrant to the behavior of this well-respected and admired young man.

## **Conclusion**

Sahilal Sabaratnam will be sentenced for his brief involvement as a last minute participant in a government sting operation. Crimes of this type are usually committed out of political and/or religious zeal or vengeance. However, Sahil's limited involvement stemmed from a request from his brother-in-law, Thani, whom Sahil respected as a trusted family member and mentor. Without a doubt, Sahil should have removed himself from involvement once he learned of the nature of the trip to the United States. Without a doubt, Sahil made the worst decision of his life and, in turn, has forfeited his liberty, future, hopes and dreams and extinguished hopes and dreams of his parents, family members and fiancé.

The accompanying letters from those who know Sahil to be a good, kind, law-abiding individual underscore the fact that this regrettable mistake and lapse of judgment are aberrant to the true Sahilal Sabaratnam. The serious repercussions of this uncharacteristic event in an otherwise promising and respectable life will permanently vanquish his potential. We respectfully urge the Court to consider these letters as representative of Sahil's good character, good deeds, and true being, which more than outweigh the categorization of him as a criminal wrongdoer.

The Court lacks the discretion to impose a sentence below the statutory mandatory minimum – and is barred from imposing a more reasonable sentence that takes into account the circumstances leading to Sahil's involvement in the charged offenses; his lack of any stake in the criminal venture; his otherwise law-abiding, productive life; the more restrictive sentence he will serve due to his lack of U.S. citizenship;  the fact that he may not receive a visit from his family members who are being denied permission to enter the United States due to the nature of the offenses of conviction.

Weighed through the lens of the § 3553(a) factors, the overall combination of circumstances and mitigating factors justifies a non-guideline sentence below the 25-year statutory maximum in order to achieve a sentence that is sufficient but not greater than necessary to meet the purposes of sentencing as codified in §3553(a)(2). In the absence of judicial discretion to do so, it is respectfully requested that the Court impose a sentence of 25 years.

8

We thank you for your consideration of this submission.

Respectfully submitted,

BOBBI C. STERNHEIM

Attachments
cc: AUSA Marshall Miller
*Via ECF (without attachments)*
*Via Express Mail (with attachments)*