

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

GDA:MLM:AEG                         *271 Cadman Plaza East*
F.#2006R01616                       *Brooklyn, New York  11201*


                                    December 21, 2009


**By Hand and ECF**

The Honorable Raymond J. Dearie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

                    Re:  United States v. Thiruthanikan Thanigasalam et al.
                         Criminal Docket No. 06-615 (S-2)(RJD)

Dear Chief Judge Dearie:

          The government respectfully submits this sentencing
letter with respect to all four defendants.[1]  The defendants
attempted to obtain high-powered military weapons, with no regard
for either the citizens of the United States or those against
whom the weapons would be used.  The defendants were committed
members of a violent terrorist group and their punishment must be
severe.  The government submits that a sentence between 40 years
and life imprisonment would be reasonable for Thiruthanikan
Thanigasalam ("Thani") and that a sentence between 35 years and
life imprisonment would be reasonable for defendant Sathajhan
Sarachandran ("Satha").  The government requests that the Court
impose a Guideline sentence of 30 years, the statutory maximum,
on defendant Nadarasa Yogarasa ("Yoga").  The government does not
oppose a non-Guideline sentence of less than life imprisonment
for the defendant Sahilal Sabaratnam ("Sahil").  Satha and Yoga
are scheduled to be sentenced on January 11, 2010.  Thani and
Sahil are scheduled to be sentenced on January 12, 2010.

---

          [1] Counsel for Nadarasa Yogarasa filed his sentencing
submission under seal.  Counsel and the government agreed that
the government would address most of Yoga's arguments herein and
request that an additional submission be filed under seal.

2

I.    Background

On January 26, 2009, moments before jury selection began, Satha pleaded guilty to a five-count superseding indictment charging him with providing, and conspiring and attempting to provide, material support to a foreign terrorist organization, the Liberation Tigers of Tamil Eelam ("LTTE"), in violation of 18 U.S.C. § 2339B, and conspiring and attempting to acquire anti-aircraft missiles, in violation of 18 U.S.C. § 2332g.  Satha pleaded guilty without an agreement with the government.  Next, Yoga pleaded guilty pursuant to a plea agreement to Counts Two and Three of that superseding indictment, charging him with conspiring and attempting to provide material support to a foreign terrorist organization, the Liberation Tigers of Tamil Eelam ("LTTE"), in violation of 18 U.S.C. § 2339B.[2]  Jury selection began and continued for the remainder of the day.

On January 27, 2009, in the middle of jury selection, Thani pleaded guilty to Counts Two through Five of the superseding indictment, charging him with conspiring and attempting to provide material support to the LTTE, in violation of 18 U.S.C. § 2339B, and conspiring and attempting to acquire anti-aircraft missiles, in violation of 18 U.S.C. § 2332g.[3] Thani pleaded guilty without an agreement with the government. Sahil's guilty plea followed: he pleaded guilty to Counts Two through Five of the superseding indictment, charging him with conspiring and attempting to provide material support to the LTTE, in violation of 18 U.S.C. § 2339B, and conspiring and attempting to acquire anti-aircraft missiles, in violation of 18 U.S.C. § 2332g.[4]  Sahil pleaded guilty without an agreement with the government.

A.    The Liberation Tigers of Tamil Eelam

Since July 1983, the LTTE has directed a campaign of terrorism in Sri Lanka.  The LTTE's terrorist acts include attacks on civilians, suicide bombings, assassinations, hostage-

---

[2] Yoga was not charged in Counts One, Four or Five of the superseding indictment.

[3] Thani was not charged in Count One of the superseding indictment.

[4] Sahil was not charged in Count One of the superseding indictment.

taking and the use of child soldiers and civilian human shields. The LTTE is the only known terrorist organization to have assassinated two heads of state, Indian prime minister Rajiv Ghandi in 1991 and Sri Lankan president Ranasinghe Premadasa in 1993.  Over time, the LTTE took control of territory in northern and eastern Sri Lanka, where it maintained a de facto government. The LTTE also maintained an army, a navy, a small air force and an elite squad of suicide bombers known as the Black Tigers.  In fact, the LTTE is well known for pioneering the use of the suicide belt.  The United States, through the State Department, designated the LTTE as a foreign terrorist organization on October 8, 1997.  More than 30 other countries have also classified the LTTE as a terrorist organization.  The LTTE remains active, and its current leader, now in exile, has vowed to reorganize the LTTE to fight from outside Sri Lanka. (Presentence Investigation Report ("PSR") ¶¶ 3, 4, 6, 7).[5]

B.    Initial Contacts

On July 30, 2006, Yoga contacted a Federal Bureau of Investigation ("FBI") confidential informant whom Yoga believed had a relationship with a black market arms dealer.  Yoga told the informant that Satha wanted to meet with the informant about a potential arms deal.  The following day, the informant and Yoga met in Queens with Satha, who had come from Canada for the meeting.  Satha told the informant and Yoga that a "big guy" in Canada -- Thani -- was in direct contact with Pottu Amman, the head of the intelligence and operations wing of the LTTE.  Satha also said that he himself had met with LTTE supreme leader Vellupillai Prabhakharan.  Satha told the informant that Thani would travel to Sri Lanka to obtain permission from LTTE superiors for an arms purchase.  Specifically, Satha said that the LTTE needed weapons to shoot down Sri Lankan military aircraft.  (PSR ¶¶ 6, 8; Addendum to the Presentence Report, incorporating information and corrections noted in letters from the government to Frank M. Marcigliano, Jr., July 22, 2009 ("Gov. Let."); Gov. Let. 1).[6]

Next, Yoga drove Satha to LaGuardia Airport, then returned to engage in a second meeting with the informant.  Yoga provided the informant with Satha's email address and discussed

---

[5] Except where otherwise noted, citations to PSR refer to Thani's PSR.

[6] Citations to Gov. Let. refer to the government's letter concerning Thani's PSR.

the logistics of the weapons transaction.  Yoga stated that he was also "trying to arrange another deal."  (Gov. Let. 1-2 (containing citations and quotations of transcripts of recorded conversations)).

After the meeting, the FBI directed the informant to send an email to Satha asking if he should send Satha photos of the merchandise.  Satha replied that the informant should do so, and the FBI, using the informant's email account, sent Satha photos of an SA-18 Russian-made, shoulder-fired, guided anti-aircraft missile launcher and an SA-18 surface-to-air missile. The email listed a price of $75,000 for the SA18 with one missile, plus $50,000 for an additional missile.  Soon thereafter, Satha advised Yoga that he needed American-made AK-47 assault rifles in addition to the missiles.  (PSR ¶ 9).

On August 7, 2006, Yoga and the informant met again in Queens.  Yoga and the informant called Satha, who said that he had forwarded the photos of the merchandise to his LTTE contact. Yoga stated that he had previously done another deal for the LTTE that involved "vehicles."  Yoga also referenced a previous transaction apparently involving weapons, stating: "Previously we had bought one which can be fired from a pad."  Later during the meeting, to reassure the informant regarding the missile transaction under negotiation, Yoga stated:

> We did another deal on that day[,] everything was done very quickly and later the delivery was made in another country.  Everything was finished very quickly.  We had no problem receiving the money from the other end.  There is no problem for money and we can get anything. . . .  That is why if this guy comes along[,] meets with your guy directly[,] everything could be finished.

Satha later told the informant that individuals at the highest levels of the LTTE had seen the photos of the merchandise and were very interested in making the purchase.  (PSR ¶ 10; Gov. Let. 2 (containing citations and quotations of transcripts of recorded conversations)).

C.    Travel to Sri Lanka

On August 10, 2006, Thani arrived in Sri Lanka to meet with LTTE leadership and obtain approval for the transaction, as well as a list of weapons the LTTE needed.  On August 13, after obtaining approval, he returned to Canada.  The following day, August 14, he met with Satha in Toronto.  Also on August 14, an

undercover FBI agent posing as a black market arms dealer called Satha to discuss the transaction.  During the call with the undercover agent, Satha said that he wanted to see the merchandise.  Satha and the undercover agent agreed to meet in Long Island, New York.  Also during the telephone call, referring to Thani's return the day before from Sri Lanka, Satha described his "partner" who "arrive [sic] right now from the other countries," and told the undercover agent, in sum and substance, that he was going to meet with his partner that night.  RCMP officers performing surveillance that evening observed Satha and another individual enter a Ford Escape registered to Thani -- the same car that Thani, Satha and Sahil later drove to New York to engage in the weapons transaction.  On August 15, Satha told the informant that Thani had returned from Sri Lanka and that they planned to meet with the "arms dealer" on August 19.  Satha said that four people, including himself and Thani, would travel to New York City for the meeting.  Satha asked the informant to tell the arms dealer that the LTTE wanted to buy 50 to 100 missiles.  (PSR ¶ 11; Gov. Let. 2).

On August 18, 2006, Thani, Satha, Sahil and Piratheepan Nadarajah ("Nada") drove toward New York to meet with the arms dealer.  At the border between Canada and New York, they lied to Customs and Border Protection officers about their destination, falsely claiming that they were going to a bachelor party in Buffalo.  The officers denied entry to Nada because of his criminal record, but permitted the rest of the group to enter the United States.  The defendants then drove through the night to reach New York City in time for their meeting.  (PSR ¶ 12).

        D.    The Arms Deal

On August 19, 2006, Thani, Satha, Sahil and the informant met at a Dunkin Donuts in Long Island, then followed an undercover agent posing as a partner of the arms dealer to a warehouse.  At the warehouse, Thani, Satha, Sahil and the informant met with the undercover agent posing as the arms dealer and another undercover agent posing as his technical expert.  This meeting was recorded with video and audio equipment.  A copy of the video recording of the meeting, with subtitles, is enclosed for the Court's review.  The parties examined the weapons and discussed payment, delivery and training.  Thani took charge of the discussion, telling the undercover agents which weapons the LTTE needed.  He also explained that payment could be available as soon as two or three days later.  (PSR ¶ 13).

Thani advised that the weapons should be delivered to an LTTE ship in the Indian Ocean.  All of the defendants handled

the weapons in a manner that indicated they had received weapons training, and Thani made comments on highly technical aspects of the weapons' capabilities.  Thani also referred to his prior engagement in a transaction involving high-tech night vision goggles, demonstrating his prior experience in procuring military equipment for the LTTE.  (PSR ¶ 14; Gov. Let. 4; Gov. Let. Exh. E, at 30-31 (Thani details capabilities of Sri Lankan Kfir military aircraft, including missile evasion system, and SA-18 guided missiles, including introducing discussion of "infrared" guidance system), 33 (Thani inquires about availability of missiles to attack Sri Lankan Dvora military boats), 33-34 (Thani inquires about availability of laser-guided weaponry), 36-37 (Thani expresses need for Russian or American AK-47s and explains problem with Chinese AK-47s), 48-49 (Thani indicates knowledge of market price and rate of success for SA-18 missiles), 55 (Sahil indicates, pointing at Thani, that Thani "is just as good" at technical evaluation of the missiles as Nada), 68 (Thani identifies tank models used by Sri Lankan military and Tamil Tigers), 72 (Thani requests fire finders to pinpoint enemy fire), 117-19 (Thani identifies the night vision goggles as inferior, dated technology based on looking at and handling them), and 121-22 (Thani tells the informant in Tamil that the weaponry he handled is "excellent stuff")).

Thani and Sahil also demonstrated accurate and detailed knowledge of the procurement methods and training techniques of the LTTE, including descriptions by Thani and Sahil of ship-to-ship transfers, ports utilized by the LTTE in Asia, methods for smuggling weaponry into LTTE-controlled territory and the LTTE's training regimens.  Had the case proceeded to trial, the government was prepared to call an expert witness who would have testified that Thani and Sahil's descriptions of the LTTE's weaponry, military tactics, procurement methods and training techniques were accurate and up-to-date.  Finally, in negotiating the provision of a weapons expert to train the LTTE in using the SA-18 guided anti-aircraft missile system, both Thani and Sahil informed the undercover agents that they could personally guarantee the safety of the training expert in LTTE territory. (Gov. Let. 4 (containing citations of transcripts of recorded conversations)).

The defendants negotiated a final price of $900,000 to $937,500 for 10 SA-18 guided missile launchers, 20 SA-18 guided missiles, 500 AK-47s and the services of a trainer.  Agents then arrested Thani, Satha and Sahil.  The informant later met with Yoga, who expressed satisfaction with the results of the meeting. Agents then arrested Yoga.  (PSR ¶¶ 15, 16).

E.    Search of Satha's Home

        The Royal Canadian Mounted Police ("RCMP") performed a court-authorized search of Satha's residence in Scarborough, Ontario on August 21, 2006.  During the search, the RCMP found substantial evidence of Satha's provision of material support to the LTTE, including assorted LTTE propaganda items and documents; photographs of Satha in Sri Lanka; and electronic media, including a desktop computer, a laptop computer and a thumb drive containing evidence of material support for the LTTE.  (Gov. Let. 5).

        First, the propaganda items seized during the search included an LTTE flag, a framed photograph of LTTE leader Velupillai Prabhakaran, a photograph labeled as depicting LTTE "special commandos" and numerous compact discs containing LTTE songs, a common LTTE fundraising tool.  The cover of one disc seized during the search depicted dozens of Black Tigers, members of the LTTE's elite suicide bomber unit, encased in flame.  In Satha's home, the RCMP also seized a letter on LTTE letterhead announcing the appointment of a worldwide Tamil Youth Organization ("TYO") Coordinator, demonstrating the LTTE's control of the TYO.  (Gov. Let. 5).

        Second, photographs seized by the RCMP capture Satha in Sri Lanka engaging in the following conduct: firing a rifle under the supervision of LTTE fighters; handling a machine gun; aboard a ship flying the flag of the Sea Tigers, the LTTE's naval unit; and meeting with LTTE fighters.  (Gov. Let. 5).

        Third, among the seized electronic media, the RCMP took possession of Satha's desktop computer, containing additional evidence of his support for the LTTE, including, inter alia: photos of LTTE leaders and fighters, a photo of an LTTE funeral, videos containing reports of the LTTE's actions, and diagrams of LTTE military positions.  The computer also contained evidence of Satha's own efforts to support the LTTE, including, inter alia: photos of Kfir jets, the type used by the Sri Lankan army that Satha and his coconspirators sought weapons to combat; the results of an online search for rifle scopes; and the results of an online search for night-vision goggles.  The seized laptop computer contained photos of the SA-18 missile that the JTTF's informant sent to Satha on August 2, 2006.  Finally, the seized thumb drive contained videos advertising unmanned aerial vehicles with thermal imaging and attack capabilities and separate files containing the specifications of such vehicles; a brochure advertising surveillance systems for "force protection, homeland security and law enforcement[]"; and a letter signed by Satha as

"TYO Coordinator - Canada," referring to the Tamil Youth Organization, which, as discussed above, was controlled by the LTTE.  (Gov. Let. 5-6).

### F.    Search of Satha's Email Account

A court-authorized search of Satha's email account, truthfun@gmail.com, revealed emails, dated November 21, 2005, in which Satha discussed a request for "wireless communication" equipment, towers and "hack" software.  In addition, Satha emailed PDF documents detailing the capabilities of high-tech military technology products from Kongsberg Defence & Aerospace, including, inter alia, border surveillance equipment, "ComBatt" Command and Control Information systems, Artillery Fire Support applications, battlefield service networks and encrypted radio and communications systems.  In addition, from Satha's email account, JTTF agents seized the emails between Satha and the JTTF's informant and Satha and codefendant Yoga regarding the weapons transaction.  Finally, JTTF agents seized an email sent from Satha's email account on August 8, 2006 to an email account in the United Kingdom in which Satha forwarded the photographs of the SA-18 missile and the prices provided by the JTTF's informant for the missile to a coconspirator.  (Gov. Let. 6).

### G.    Post-Offense Conduct

During the prosecution of this case, Satha and Thani attempted to mislead the Court through attorney affirmations in an effort to manufacture a duress defense.  Specifically, they falsely claimed that they committed the charged crimes to help Satha's parents, who had purportedly been kidnaped in Sri Lanka. Thani's affirmation was contradicted by consensual recordings and travel records.  Phone calls Satha made while incarcerated reveal that his affirmation was fabricated.  During a call to his father, Satha coached his father on what to say about his alleged kidnaping, including changing the date of the alleged kidnaping to ensure that it would be before the arms deal.  (PSR ¶¶ 19, 41).

## II.  Argument

For the reasons discussed below, the Court should impose a sentence between 40 years and life imprisonment on Thani and a sentence between 35 years and life imprisonment on Satha. The Court should impose a Guideline sentence of 30 years, the statutory maximum, on Yoga.  The government does not oppose a non-Guideline sentence of less than life imprisonment for Sahil.

9

A.    Legal Standard

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  "Even after Gall and [Kimbrough v. United States, 552 U.S. 85 (2007)], sentencing judges, certainly, are not free to ignore the Guidelines, or to treat them merely as a body of casual advice."  United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).  Next, a sentencing judge should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented."  Gall, 552 U.S. at 49-50 (citation and footnote omitted).  "'When a factor is already included in the calculation of the guidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the guidelines calculation.'"  United States v. Sindima, 488 F.3d 81, 87 (2d Cir. 2007) (citation omitted, alterations in Sindima).  When a district court imposes a sentence outside the recommended Guideline range, it "'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'"  Cavera, 550 F.3d at 189 (quoting Gall, 552 U.S. at 50).

B.    The Probation Department's Guideline Analysis

The government agrees with the applicable Guideline range assigned to each defendant in his PSR.

1.    Satha

The PSR calculates Satha's total offense level to be 53 and his Criminal History Category to be VI.  (Satha PSR ¶¶ 61-86).  Pursuant to U.S.S.G. Ch. 5, Pt. A, App. Note 2, the offense level is to be treated as 43, the highest level listed in the sentencing table, resulting in an applicable Guideline range for counts Four and Five of life imprisonment.  (Satha PSR ¶ 110).[7]

---

[7] As noted in the government's objections to the PSR, filed July 22, 2009, in the government's view the total offense level

10

Those counts are subject to a mandatory minimum sentence of 300 months' incarceration.  <u>See</u> 18 U.S.C. § 2332g(c)(1).  Because Counts One, Two and Three are subject to statutory maximum sentences of 180 months, <u>see</u> 18 U.S.C. § 2339B(a)(1), the applicable Guideline range for those counts is 180 months.  <u>See</u> U.S.S.G. § 5G1.1(a).

Satha argues that he is entitled to a two-level reduction in offense level pursuant to U.S.S.G. § 3E1.1(a) because his guilty plea demonstrates his acceptance of responsibility.  (Letter from Anthony L. Ricco and Edward D. Wilford to the Hon. Raymond J. Dearie, Dec. 14, 2009 ("Satha Br.") at 5).  Satha is not entitled to such a reduction because he obstructed justice by submitting a false attorney affirmation to the Court.  <u>See</u> U.S.S.G. § 3E1.1(a) App. Note 4 (providing that defendant who receives enhancement for obstruction of justice is not ordinarily entitled to reduction for acceptance of responsibility).  Satha also argues that he is entitled to an offense level reduction pursuant to U.S.S.G. § 3B1.2 because he played a minor or minimal role in the offense.  (Satha Br. 5).  As described above, Satha was the primary organizer of the arms deal.  He is not entitled to a reduction based on his role.[8]

        2.    <u>Sahil</u>

The PSR calculates Sahil's total offense level to be 49 and his Criminal History Category to be VI.  (Sahil PSR ¶¶ 61-82).  Pursuant to U.S.S.G. Ch. 5, Pt. A, App. Note 2, the offense level is to be treated as 43, the highest level listed in the sentencing table, resulting in an applicable Guideline range for counts Four and Five of life imprisonment.  (Sahil PSR ¶ 110).[9]

---

should be 59 because Satha should receive a 10-point enhancement pursuant to U.S.S.G. § 2K2.1(b)(1)(E) rather than a 4-point enhancement pursuant to U.S.S.G. § 2K2.1(b)(1)(B), because the offense involved the purchase of 500 AK-47 assault rifles in addition to ten SA-18 guided anti-aircraft missiles.  Under either analysis, the effective offense level is 43.

[8] Because Satha does not press his Guideline analysis arguments in detail, the government will not address them further.

[9] As noted in the government's objections to the PSR, filed July 22, 2009, in the government's view the total offense level should be 55 because Sahil should receive a 10-point enhancement pursuant to U.S.S.G. § 2K2.1(b)(1)(E) rather than a 4-point

Those counts are subject to a mandatory minimum sentence of 300 months' incarceration.  See 18 U.S.C. § 2332g(c)(1).  Because Counts Two and Three are subject to statutory maximum sentences of 180 months, see 18 U.S.C. § 2339B(a)(1), the applicable Guideline range for those counts is 180 months.  See U.S.S.G. § 5G1.1(a).

   3. <u>Thani</u>

  The PSR calculates Thani's total offense level to be 53 and his Criminal History Category to be VI.  (PSR ¶¶ 61-86, 111; Second Addendum to the Presentence Report (Thani), Nov. 20, 2009).  Pursuant to U.S.S.G. Ch. 5, Pt. A, App. Note 2, the offense level is to be treated as 43, the highest level listed in the sentencing table, resulting in an applicable Guideline range for counts Four and Five of life imprisonment.  (PSR ¶ 111).[10] Those counts are subject to a mandatory minimum sentence of 300 months' incarceration.  See 18 U.S.C. § 2332g(c)(1).  Because Counts Two and Three are subject to statutory maximum sentences of 180 months, see 18 U.S.C. § 2339B(a)(1), the applicable Guideline range for those counts is 180 months.  See U.S.S.G. § 5G1.1(a).

   4. <u>Yoga</u>

  The PSR calculates Yoga's total offense level to be 38 and his Criminal History Category to be VI, resulting in a Guideline range of 360 months to life imprisonment.  (Yoga PSR ¶¶ 62-78, 114).  Because Counts Two and Three are subject to statutory maximum sentences of 180 months, see 18 U.S.C. § 2339B(a)(1), the applicable Guideline range is 180 months.  See U.S.S.G. § 5G1.1(a).

---

enhancement pursuant to U.S.S.G. § 2K2.1(b)(1)(B), because the offense involved the purchase of 500 AK-47 assault rifles in addition to ten SA-18 guided anti-aircraft missiles.  Under either analysis, the effective offense level is 43.

[10] As noted in the government's objections to the PSR, filed July 22, 2009, in the government's view the total offense level should be 59 because Thani should receive a 10-point enhancement pursuant to U.S.S.G. § 2K2.1(b)(1)(E) rather than a 4-point enhancement pursuant to U.S.S.G. § 2K2.1(b)(1)(B), because the offense involved the purchase of 500 AK-47 assault rifles in addition to ten SA-18 guided anti-aircraft missiles.  Under either analysis, the effective offense level is 43.

B.   <u>The Terrorism Enhancements Are Appropriate</u>

For the reasons discussed below, the Probation Department properly applied the terrorism enhancement to all of the defendants' offense levels.

1.   <u>The Terrorism Enhancement to Sahil's and Thani's Offense Levels is Appropriate</u>

The Probation Department correctly applied a 12-point enhancement to all of the defendants' offense levels pursuant to U.S.S.G. § 3A1.4(a) because the offense involved a federal crime of terrorism, that is, an offense listed in 18 U.S.C. § 2332b(g)(5)(B) that was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  In this case, the defendants were convicted of violating 18 U.S.C. §§ 2332g and 2339B, both of which are listed in 18 U.S.C. § 2332b(g)(5)(B)(i). It is plain that they intended to influence or affect the conduct of the Sri Lankan government by intimidation or coercion, because the purpose of the crime was to obtain high-powered weapons for the LTTE to use against that government in pursuit of its political objectives.  Indeed, Sahil and Thani do not dispute that, by its terms, the enhancement applies to them.

Sahil and Thani argue that applying the enhancement impermissibly double-counts conduct already incorporated in their base offense levels.  (Letter from Bobbi C. Sternheim to the Hon. Raymond J. Dearie, dated Nov. 30, 2009 and filed Dec. 1, 2009 ("Sahil Br.") at 2; Letter from Lee Ginsberg to the Hon. Raymond J. Dearie, Nov. 30, 2009 ("Thani Br.") at 3-4).  They are mistaken.  The Second Circuit has held that "a district court calculating a Guidelines sentence may apply multiple Guidelines provisions based on the same underlying conduct where that is the result clearly intended by Congress and the Sentencing Commission.  While such calculations may involve 'double counting' in a literal sense, they do not involve impermissible double counting."  <u>United States v. Maloney</u>, 406 F.3d 149, 152 (2d Cir. 2005) (Sotomayor, J.).  Furthermore, "double counting is permissible in calculating a Guidelines sentence where . . . each of the multiple Guidelines sections applicable to a single act serves a distinct purpose or represents a discrete harm."  <u>Id</u>. at 153.  Both of these rationales support applying the terrorism enhancement in this case.

With respect to Counts Two and Three, the base offense level is determined by U.S.S.G. § 2M5.3(a) (PSR ¶ 62), the Guideline applicable to provision of material support to foreign

13

terrorist organizations and certain other offenses.  See 18 U.S.C. §§ 2283, 2284, 2339C.  First, nothing in that Guideline, the terrorism enhancement Guideline or the material support statute suggests that courts should not apply the terrorism enhancement to defendants convicted of providing material support to terrorists and terrorist organizations.  Therefore, doing so is not impermissible double counting.  See United States v. Hammoud, 381 F.3d 316, 356 (4th Cir. 2004) (rejecting double-counting challenge to application of terrorism enhancement in Section 2339B prosecution), vacated on other grounds, 543 U.S. 1097 (2005), reinstated in relevant part, 405 F.3d 1034 (4th Cir. 2005).

Second, the Guideline associated with the material support statute and the terrorism enhancement serve distinct purposes and target different harms.  The material support statute prohibits the provision of material support to designated foreign terrorist organizations.  The Guideline associated with the statute thus gives effect to the Secretary of State's designation of a group as a foreign terrorist organization.  To be so designated, an organization must engage in terrorist activity or terrorism, or retain the capability or intent to do so.  See 8 U.S.C. § 1189(a)(1)(B).  Terrorist activity includes, among other things, hijacking any conveyance, seizing or threatening an individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act, and the use of any biological chemical agent.  See 8 U.S.C. § 1182(a)(3)(B).  The terrorist enhancement, on the other hand, applies only if the offense involved was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. § 2332b(g)(5)(A).  The enhancement thus reflects the discrete harm caused by crimes committed with the intent to influence or retaliate against a government.  None of the types of terrorist activity listed above necessarily involves such intent.  As a result, a defendant convicted of providing material support to a designated foreign terrorist organization is not necessarily subject to the terrorism enhancement, demonstrating that the two provisions address different harms.  Cf. In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 153 (2d Cir. 2008) (rejecting double-counting objection to hate crime, government victim and terrorism enhancements following conviction for conspiracy to murder U.S. nationals and conspiracy to murder officers or employees of the United States, reasoning, "While it may be that some offenses, such as those committed by El-Hage, trigger all three enhancements because they constitute (1) acts of terrorism that targeted victims based on (2) their perceived national origin and (3) their status as government

14

employees, it is equally plain that a terrorist act need not necessarily target government victims or select its victims on the basis of national origin; nor do all offenses that target victims based on their (a) national origin or (b) status as government employees constitute acts of terrorism; and, almost needless to say, crimes targeting victims on the basis of national origin need not entail any animus whatsoever toward government employees and vice versa.").

With respect to Counts Four and Five, conspiring and attempting to acquire anti-aircraft missiles, the base offense level is determined by U.S.S.G. § 2K2.1(a)(4)(B), because the offense involved a destructive device.  (PSR ¶ 68).  Sahil and Thani point to nothing in the Guidelines or applicable statute suggesting that Congress or the Sentencing Commission intended to preclude courts from applying both U.S.S.G. § 2K2.1(a)(4)(B) and the terrorism enhancement.  Furthermore, the two Guideline provisions address entirely different harms: that caused by trafficking in destructive devices, and that caused by particular crimes committed with the intent to influence or retaliate against a government.

2.    The Terrorism Enhancement to Sahil's and Thani's
       Criminal History Categories is Appropriate

The Probation Department correctly placed all of the defendants in Criminal History Category VI pursuant to U.S.S.G. § 3A1.4(b), which provides that all defendants subject to the terrorism enhancement "shall" be placed in Criminal History Category VI.  Sahil and Thani argue that they should nonetheless be placed in Criminal History Category I.  (Sahil Br. 2; Thani Br. 4).  Thani cites United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003), in which the court rejected the defendant's argument that the terrorism enhancement's increase of both offense level and Criminal History Category was impermissible. The court noted in dicta that, "in exceptional cases," district courts could grant downward departures in Criminal History Category pursuant to U.S.S.G. § 4A1.3(b) to defendants subject to the terrorism enhancement.  Id.  But Sahil and Thani cite no case in which such a departure was granted, and they point to nothing that makes their cases exceptional.  On the contrary, although Thani has no prior convictions, the record demonstrates that he has significant prior experience providing material support to the LTTE.  Criminal History VI thus appropriately reflects Thani's actual long-term criminal activity in support of a terrorist organization.

15

### 3.    Yoga Qualifies for the Terrorism Enhancement

Yoga qualifies for the terrorism enhancement.  First, Yoga argues that the terrorism enhancement does not apply because he lacked the intent required.  (Letter from Steve Zissou and Elizabeth E. Macedonio to the Hon. Raymond J. Dearie, Nov. 30, 2009 ("Yoga Br.") at 6-8).  For the enhancement to apply, the offense must involve or be intended to promote a "federal crime of terrorism."  U.S.S.G. § 3A1.4.  Application Note 1 states that the term "federal crime of terrorism" has the meaning given at 18 U.S.C. § 2332b(g)(5), which indicates that a federal crime of terrorism is any of certain specified federal crimes when it is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. § 2332b(g)(5)(A).  The record demonstrates that Yoga intended to provide weapons to the LTTE.  (PSR ¶¶ 16 (Yoga expressed satisfaction with the results of the arms deal meeting), 52 (Yoga discussed with Satha the types of weapons the LTTE sought); Gov. Let. Ex. A, at 6 (Yoga tells informant that Satha is "not from the Government"), 7 (Yoga tells informant that in addition to Satha "there is another guy appointed by the section for this buy"), 11 (Yoga tells informant that the weapons are "going to the Tigers"); Gov. Let. Ex. B, at 13 (Yoga tells informant that Satha and Thani are connected to Pottu Amman), 22 (Yoga tells informant, "These are the guys who are doing everything.  This is the group which is doing everything.  No one else is doing anything.  Before they had many groups doing things.  Now they have got everything under control.").

Second, Yoga argues that the terrorism enhancement does not apply because, even if he did intend to affect the conduct of a government, that government was the government of Sri Lanka, and the terrorism enhancement applies only to conduct intended to affect the conduct of the United States government.  (Yoga Br. 8-10).  As noted above, for the enhancement to apply, the offense must be intended to affect "the conduct of government" or to retaliate against "government conduct."  18 U.S.C. § 2332b(g)(5)(A).  Although the Second Circuit has not decided the issue, other courts have concluded that the terrorism enhancement applies to conduct intended to affect or retaliate against any government, not only the United States government. See United States v. Puerta, 249 Fed. Appx. 359, 360 (5th Cir. 2007) (per curiam) (unpublished); United States v. Assi, 586 F. Supp. 2d 841, 849 (E.D. Mich. 2008); United States v. Awan, 2007 WL 2071748, at *4 n.16 (E.D.N.Y. July 17, 2007) (concluding that this "appears to be the correct reading of the statute"); United States v. Aref, 2007 WL 804814, at *2 (N.D.N.Y. Mar. 14, 2007); United States v. DeAmaris, 406 F. Supp. 2d 748, 750-51 (S.D. Tex.

16

2005); see also United States v. Thurston, 2007 WL 1500176, at *17 (D. Or. May 21, 2007) (holding that terrorism enhancement applies to conduct intended to affect state or local government). As the court noted in DeAmaris, 18 U.S.C.A. § 2332b(b)(1)(C) refers to "the United States Government."  Congress thus demonstrated in this very section that it knew how to refer specifically to the United States government when it intended to do so.  The fact that Congress left "government" unmodified in the definition of federal crime of terrorism means that it intended the word to mean something other than the United States government.  See DeAmaris, 406 F. Supp. 2d at 750; see also Dean v. United States, 129 S. Ct. 1849, 1854 (2009) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted; alteration in Dean)).

Yoga argues that the government referred to in the definition of the term "federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5) must be the United States government because the crime of committing an act of terrorism transcending national boundaries, defined in 18 U.S.C. § 2332b(a), involves persons or property "within the United States."  (Yoga Br. 8-9).  The Second Circuit has rejected a similar argument.  In United States v. Salim, 549 F.3d 67, 77 (2d Cir. 2008), the court rejected the argument that a "federal crime of terrorism" must involve conduct transcending national boundaries.  The defendant's argument was based primarily on the fact that the two terms appeared within the same section of the criminal code.  See id.  The court concluded that the definition of "federal crime of terrorism" did not incorporate elements of the crime of committing acts of terrorism transcending national boundaries:

> We recognize that the offenses punished by section 2332b are those "involving conduct transcending national boundaries," 18 U.S.C. § 2332b(a)(1), but [the defendant] was not charged with or convicted of violating that statute.  Our focus is only on subsection 2332b(g)(5), the particular subsection of section 2332b that the Sentencing Commission cross-referenced in the commentary to U.S.S.G. § 3A1.4.  The sentencing enhancement for a federal crime of terrorism is not limited to conduct that constitutes an offense under section 2332b; it applies to any conduct that meets the definition of subsection (g)(5).

Id. at 78.  The same principle applies here.  The fact that the offense defined in 18 U.S.C. § 2332b(a) involves persons or property within the United States simply has no bearing on the meaning of "federal crime of terrorism," which is defined in a separate subsection of the statute.

C.    Sahil is Not Entitled to a Downward Departure

Sahil argues that the Court should grant him a downward departure because his crimes were aberrant behavior.  (Sahil Br. 1, 4-8).  Sahil is not entitled to such a departure.  Pursuant to U.S.S.G. § 5K2.20, the Court may depart downward on the basis of aberrant behavior "only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life."   U.S.S.G. § 5K2.20(b).  Sahil does not qualify for this departure because he took part in significant planning for the arms deal.  On August 18, 2006, Sahil and his co-conspirators drove overnight to reach New York in time for the meeting.  During this drive, when they reached the United States-Canada border, the conspirators lied to authorities about where they were going.  Although one conspirator, Nada, was turned away at the border, Sahil and the other conspirators drove on.  When they reached New York, they met first with the informant at a Dunkin Donuts.  Then they followed an undercover agent posing as a partner of the arms dealer to a warehouse, where they engaged in a lengthy negotiation.  This sequence of events demonstrates significant planning by the conspirators, including Sahil.  It also reveals several points at which Sahil could have withdrawn from the conspiracy -- when Nada was refused entry to the United States, during or after the meeting at Dunkin Donuts, and at any moment throughout the arms deal meeting itself.  Sahil did not take advantage of these opportunities, but instead participated actively in the scheme.  In addition, through statements at the arms deal meeting, Sahil and his co-conspirators established that Sahil played an important role in the conspiracy, one that entailed significant planning: the role of financial expert. (Gov. Let. 4).

D.    Yoga is Not Entitled to a Role Reduction

Yoga argues that the Court should reduce his offense level by two levels because he was a minor participant in the offense.  (Yoga Br. 10-11 (citing U.S.S.G. § 3B1.2(b))).  Yoga is not entitled to such a reduction.  As described above, Yoga

directed Satha to the informant because Yoga believed the informant could supply the LTTE with weapons. (PSR ¶ 52). Yoga relayed messages between Satha and the informant and attended their meetings. (PSR ¶ 52). Yoga admitted that he had engaged in similar transactions in the past for the LTTE. (PSR ¶ 10; Gov. Let. 2). Yoga was a central participant in the crime, not a minor participant.

E.    A Guideline Sentence is Appropriate for Satha, Thani and Yoga

Satha argues that a sentence at the mandatory minimum of 300 months is appropriate. (Satha Br. 19). Thani argues that a sentence at the mandatory minimum of 300 months is appropriate. (Thani Br. 5-9). For the reasons discussed below, these arguments are meritless. The government submits that a sentence between 40 years and life imprisonment would be reasonable for Thani and that a sentence between 35 years and life imprisonment would be reasonable for Satha.

Yoga requests a sentence of 51 months, the bottom of the Guideline range that he contends applies. (Yoga Br. 1, 11). As discussed above, the government submits that the applicable Guideline range is 180 months for each count. For the reasons discussed below, the government requests that the Court impose the statutory maximum of 360 months' imprisonment.

Sahil requests a non-Guideline sentence no greater than the mandatory minimum of 25 years. (Sahil Br. 1). For the reasons discussed below, the government does not oppose a non-Guideline sentence for Sahil.

1.    Sahil's Foreign Citizenship Does Not Justify a Non-Guideline Sentence

Sahil argues that he should receive a non-Guideline sentence because, as a foreign citizen, he is ineligible for certain programs while serving his sentence. (Sahil Br. 2-3). Sahil's citizenship does not justify a non-Guideline sentence. Contrary to the cases Sahil cites from other jurisdictions, in the Second Circuit the collateral consequences of a defendant's status as a foreign citizen are not a permissible basis for a downward departure. See United States v. Restrepo, 999 F.2d 640, 641 (2d Cir. 1993). Even after United States v. Booker, 543 U.S. 220 (2005), the Second Circuit continued to hold that a defendant's future deportation was not a proper basis for imposing a lesser sentence, at least absent finding "with some particularity" that the defendant was "certain to be deported and

that deportation, in view of [the defendant's] individual circumstances, will serve to protect the public." United States v. Wills, 476 F.3d 103, 111 (2d Cir. 2007).  The Supreme Court's decision in Kimbrough, 552 U.S. at 109, has arguably overruled the circuit's prior law on this issue.  See Cavera, 550 F.3d at 191.  Even if the Court now has authority to impose a lesser sentence as a result of Sahil's foreign citizenship, it should not do so.  See Butt v. United States, 2009 WL 36851, at *3-*4 (E.D.N.Y. Jan. 6, 2009) (concluding post-Kimbrough that collateral consequences of alienage do not justify reduced sentence); United States v. Roget, 2008 WL 4696128, at *1, *4 (D. Conn. Oct. 17, 2008) (same); Rosario v. United States, 625 F. Supp. 2d 123, 130 (S.D.N.Y. 2008) (same).  Granting such a reduction in sentence would be particularly inappropriate for a defendant convicted of providing material support to a foreign terrorist organization.  This offense is among the most serious a defendant can commit, but by its nature many defendants who do so are, like Sahil, foreign citizens.  Furthermore, Sahil entered the United States -- with the aid of a lie to United States authorities -- for the sole purpose of committing this crime.  He should not now benefit from that fact through a lesser sentence.

    2.    Section 3553(a)(1): Nature and Circumstances of the Offense

        The defendants negotiated on behalf of the LTTE in the intended purchase of 10 shoulder-fired, heat-seeking, anti-aircraft missile launchers, 20 anti-aircraft missiles, 500 AK-47 assault rifles, and the services of an expert to train LTTE operatives in the use of these weapons.  Before the negotiation meeting, Thani traveled from Canada to Sri Lanka to meet with high-level LTTE officials, apparently including intelligence and operations chief Pottu Amman, to obtain approval for the deal. As demonstrated by the materials seized from Satha's home and computer, and by Thani's statements at the arms deal meeting, Satha and Thani had engaged in multiple previous efforts to obtain high-tech equipment for the LTTE.  After they were arrested, Satha and Thani submitted to the Court detailed lies in an attempt to manufacture a legal defense to the charges.  Had the defendants succeeded in their effort to purchase high-tech anti-aircraft weapons for the LTTE, there is little doubt that lives would have been lost in Sri Lanka.  These circumstances all weigh in favor of Guideline sentences, and in any event sentences greater than the minimum permitted by statute.

        Satha asserts that the war between the government of Sri Lanka and the LTTE is over.  (Satha Br. 18).  He ignores the fact that the LTTE's current leader has vowed to continue

20

fighting for an independent Tamil state.  In any event, however, the Court need not speculate on the future of Sri Lanka and the LTTE.  At the time that the defendants committed their crimes, the LTTE's campaign of terrorism was in full swing.

Thani notes "the level of desperation embodied in many Tamils in Sri Lanka and abroad" because of the conflict in Sri Lanka, during which the government of Sri Lanka has been accused of serious misconduct in its treatment of Tamils.  (Thani Br. 2). Thani's sentencing is not an appropriate vehicle for resolving this long-running dispute.

        3.    <u>Section 3553(a)(1): History and Characteristics of the Defendants</u>

        a.    <u>Satha</u>

Satha asserts that until 2006 he was a peaceful advocate for young Tamils in Canada, working with both the Tamil Student Association at Windsor University and the TYO.  (Satha Br. 11).  He reports that through the TYO he organized two trips to Sri Lanka, apparently both in 2003.  (Satha Br. 12-13).  Satha claims that he decided to help the LTTE obtain weapons "to help end the violence" only after watching a television news report in 2006.  (Satha Br. 13).  He claims that he "has absolutely no prior military or weaponry training of any type" and "has never had any training or knowledge of any weaponry or firearms of any type."  (Satha Br. 14).

These contentions are not credible.  As described above and demonstrated by evidence seized in Satha's home, the LTTE controls the TYO.  Photos found in Satha's home show that during at least one of Satha's trips to Sri Lanka he rode on an LTTE Sea Tigers ship and received weapons instruction from LTTE fighters. Furthermore, the vast quantity of LTTE paraphernalia and propaganda found in Satha's home when it was searched in August 2006, as well as the electronic files seized from his email account and computer, belie his claim that he had only recently decided to support the organization's terrorism.

        b.    <u>Sahil</u>

Sahil correctly notes that he is not a "technical weapons expert for the LTTE," as stated in the PSR.  (Sahil Br. 2).  Instead, Sahil was the financial expert who negotiated with the undercover agent regarding the terms and mechanics of payment, as well as how to avoid detection by law enforcement (<u>see</u> PSR, ¶ 13; <u>see</u> <u>also</u>, <u>e.g.</u>, Gov. Let. Ex. E, at 18 (Sahil

21

introduces the terms "red flags," "freeze the account" and "money laundering"), 19 (Sahil, Thani and Satha identify Sahil as the "money guy"), 20-21 (Sahil demands explanation of insurance that UC will not take the money and refuse to deliver the weapons)), though Sahil also demonstrated knowledge of LTTE military capabilities.  (Gov. Let. Ex. E, at 51 (Sahil identifies LTTE's anti-aircraft missile training program as video and computer "simulation")).

Nonetheless, because of Sahil's limited role in the offense relative to that of his co-conspirators, the government does not oppose a non-Guideline sentence for him.

c.    Thani

Thani's conduct in the charged crime demonstrated substantial experience in working on behalf of the LTTE, including negotiating a previous purchase of night-vision goggles.  In particular, at the meeting with the undercover agent, Thani demonstrated a level of expertise regarding weapons technology consistent with that of a seasoned arms dealer, rather than a novice in the field as he now claims.  (Gov. Let. 4). Similarly, at the meeting, Thani also demonstrated a sophisticated level of knowledge regarding the weaponry, military tactics, procurement methods and training techniques of the LTTE, again demonstrating his experience as an LTTE operative.  (Gov. Let. 4).  The fact that this offense was not Thani's first time providing support to a designated foreign terrorist organization weighs in favor of a Guideline sentence, and in any event a sentence greater than the minimum permitted by statute.

Thani asserts that while growing up in Sri Lanka he was beaten both by agents of the government of Sri Lanka and by members of the LTTE.  (Thani Br. 6).  He asserts that he was forcibly removed from his home and that his father was murdered by the LTTE.  (Thani Br. 6).  He asserts that he eventually fled Sri Lanka and began a new life in Canada, where he graduated from college, obtained employment, and became a productive member of his community.  (Thani Br. 7-8).  As noted above, earlier in the prosecution of this case Thani presented demonstrably false assertions in support of a legal defense.  While the assertions in Thani's sentencing submission are not demonstrably false, most of them are not demonstrably true either.  Moreover, Thani's explanation of how he came to work as an operative for a terrorist organization that allegedly killed his father does not add up.  The government respectfully submits that the Court should disregard or at least substantially discount this argument.

d.    Yoga

As noted above, Yoga directed Satha to the informant because Yoga believed the informant could supply the LTTE with weapons.  (PSR ¶ 52).  Yoga relayed messages between Satha and the informant and attended their meetings.  (PSR ¶ 52).  Yoga also demonstrated a detailed knowledge of the inner workings of the LTTE.  (Gov. Let. Ex. A, at 7 (Yoga tells informant that in addition to Satha "there is another guy appointed by the section for this buy"); Gov. Let. Ex. B, at 13 (Yoga tells informant that Satha and Thani are connected to Pottu Amman), 22 (Yoga tells informant, "These are the guys who are doing everything.  This is the group which is doing everything.  No one else is doing anything.  Before they had many groups doing things.  Now they have got everything under control.")).  Yoga's instrumental role in the crime and his evidently close association with the LTTE weigh in favor of a Guideline sentence.

4.    Section 3553(a)(2): The Need for the Sentence Imposed

The offenses of conspiring and attempting to provide material support to a foreign terrorist organization and attempting to purchase guided, anti-aircraft missiles are among the most serious offenses in the federal criminal code.  As set forth above, had this conspiracy achieved its objective, a terrorist organization would have gained access to almost $1 million worth of extremely high-powered weaponry, and, no doubt, additional lives would have been lost in Sri Lanka.  A sentence within the applicable Guideline range would accurately reflect the seriousness of this conduct.

Thani argues that the minimum permissible sentence is appropriate because, given his age, he is not likely to recidivate.  (Thani Br. 8-9).  Thani cites United States v. Hamilton, 323 Fed. Appx. 27 (2d Cir. 2009), which he asserts held that a "district court's failure to consider [a statistical] age-recidivism correlation constitutes sentencing error."  (Thani Br. 8-9).  Hamilton does not sweep as broadly as Thani suggests.  In that case the district court imposed sentence before the Supreme Court's decisions in Gall and Kimbrough.  See Hamilton, 323 Fed. Appx. at 30.  At that time "it was the rule in this Circuit that the district court could not consider policy disagreements with the Guidelines."  Id.  Therefore, on appeal the Second Circuit could not "assume that the district court understood that it had discretion to consider the [defendant's] policy argument disagreeing with the Guidelines' refusal to consider age and its correlation with recidivism."  Id. at 31.  As a result, the

Second Circuit vacated the defendant's sentence and remanded the case.  See id.  Hamilton does not require that a district court reduce a defendant's sentence because he falls within an age group that purportedly has a lower rate of recidivism than other age groups.  Instead, Hamilton merely requires that a district court understand that it has the authority to disagree with the Guidelines' disregard for such statistical analysis.[11]  After Gall and Kimbrough, the Court's authority is not in doubt.  The question before the Court is whether it should reduce the sentence it imposes on this defendant because of his age.  The government respectfully submits that it should not.

First, the statistical study relied on by Thani was limited to cases that are not similar to this one.  The study included only United States citizens, because it is difficult to measure recidivism among defendants who are deported, as Thani here will be.  See United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines (May 2004) ("Study") (available at http://www.ussc.gov/publicat/Recidivism_General.pdf) at 3 & n.8).  The study included only defendants who served prison sentences of seven years or less, see Study at 3, meaning that defendants who committed the most serious offenses -- as Thani here did -- were not included.  The study defined recidivism to include re-offending within two years of release, ignoring any re-offending that occurred more than two years after release.  See Study at 4.  For all of these reasons, the study's usefulness here is limited at best.

Second, the study's results do not support Thani's argument.  As suggested by its title, the purpose of the study was to evaluate the correlation between recidivism and Criminal History Category.  See Study at 2.  As noted above, Thani falls within Criminal History Category VI.  Defendants in that category had a recidivism rate more than twice that of all defendants.  See Study Ex. 2.  Even among defendants aged 41 to 50 at sentencing,[12] defendants in Criminal History Category VI had a substantially higher recidivism rate than all male defendants.

---

[11] Indeed, on remand the district court in Hamilton re-imposed the same sentence of 210 months that it had imposed before Gall and Kimbrough.  See Amended Judgment in a Criminal Case, United States v. Hamilton, No. 06-CR-064 (ARR) (Sept. 2, 2009) (available on PACER).  Hamilton's second appeal is pending.

[12] The study does not present statistics for defendants broken down by age at time of release.

24

See Study Ex. 9.  Indeed, in this age group, defendants in Criminal History Categories III, IV, V and VI had higher recidivism rates than all male defendants.  See Study Ex. 9. Thani, of course, contends that Criminal History Category VI overstates his criminal past.  (Thani Br. 4).  Thani's experience in procurement on behalf of the LTTE merits a high criminal history category.

Finally, as the Second Circuit has observed, "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."  Meskini, 319 F.3d at 92.  All of these reasons weigh in favor of a Guideline sentence, and in any event a sentence greater than the minimum permitted by statute.

5.    Sections 3553(a)(3) and (a)(4): The Kinds of Sentences Available and the Applicable Guideline Range

On Counts One, Two and Three Satha is subject to no mandatory minimum sentence and a maximum sentence of 180 months' incarceration.  See 18 U.S.C. § 2339B.  On Counts Four and Five he is subject to a mandatory minimum sentence of 300 months' incarceration and a maximum sentence of life incarceration.  See 18 U.S.C. § 2332g(c)(1).  The applicable Guideline range for Counts One, Two and Three is 180 months.  See U.S.S.G. § 5G1.1(a).  The applicable Guideline range for Counts Four and Five is life imprisonment.  (Satha PSR ¶ 110).

On Counts Two and Three Sahil is subject to no mandatory minimum sentence and a maximum sentence of 180 months' incarceration.  See 18 U.S.C. § 2339B.  On Counts Four and Five he is subject to a mandatory minimum sentence of 300 months' incarceration and a maximum sentence of life incarceration.  See 18 U.S.C. § 2332g(c)(1).  The applicable Guideline range for Counts Two and Three is 180 months.  See U.S.S.G. § 5G1.1(a). The applicable Guideline range for Counts Four and Five is life imprisonment.  (PSR ¶ 110).

On Counts Two and Three Thani is subject to no mandatory minimum sentence and a maximum sentence of 180 months' incarceration.  See 18 U.S.C. § 2339B.  On Counts Four and Five Thani is subject to a mandatory minimum sentence of 300 months' incarceration and a maximum sentence of life incarceration.  See 18 U.S.C. § 2332g(c)(1).  The applicable Guideline range for

Counts Two and Three is 180 months.  See U.S.S.G. § 5G1.1(a).
The applicable Guideline range for Counts Four and Five is life
imprisonment.  (PSR ¶ 111).

On Counts Two and Three Yoga is subject to no mandatory
minimum sentence and a maximum sentence of 180 months'
incarceration for each count.  See 18 U.S.C. § 2339B.  The
applicable Guideline range for Counts Two and Three is 180 months
on each count.  (PSR ¶ 114).  The Court may impose consecutive
sentences, for a total term of imprisonment of 360 months.  See
U.S.S.G. § 5G1.2.

6.   Section 3553(a)(6): Avoidance of Unwarranted
     Disparities

Satha and Sahil argue that the Court should impose
lesser sentences to reduce the disparity between their sentences
and the sentences imposed on six defendants prosecuted in the
District of Maryland.  (Satha Br. 18-19; Sahil Br. 3-4).  The
Court should not do so.  Pursuant to 18 U.S.C. § 3553(a)(6), the
Court must consider "the need to avoid unwarranted sentence
disparities among defendants with similar records who have been
found guilty of similar conduct."  There are several differences
between this case and the case in Maryland that render a
disparity in the sentences warranted.  First, none of the
defendants in Maryland was charged with or convicted of violating
18 U.S.C. § 2332g, which carries a mandatory minimum sentence of
25 years' incarceration.  Second, all of the defendants in
Maryland entered plea agreements with the government in which the
government dismissed as many as four counts against them.[13]
Third, five of the Maryland defendants pleaded guilty within four
months of being arraigned on an indictment, and the sixth did so
within 14 months.  Fourth, two of the defendants were not
convicted of providing material support to a foreign terrorist
organization.  Here, the defendants engaged in protracted
pretrial litigation over more than two years -- including
presenting a fraudulent defense -- before pleading guilty
immediately before and during jury selection.  All of the
defendants pleaded guilty to providing material support to a
foreign terrorist organization, and all of the defendants pleaded
guilty to all counts against them, including violations of 18
U.S.C. § 2332g by three defendants.

_____

[13] The Judgment in a Criminal Case imposed against each of
the Maryland defendants is attached hereto as Exhibit A.  The
docket sheets are available on PACER.

26

Before <u>Booker</u>, the Second Circuit held that the government's exercise of its discretion to bring different charges against different defendants for the purpose of plea bargaining did not did not justify granting a downward departure to equalize the defendants' sentences. <u>See</u> <u>United States v. Mitchell</u>, 358 F.3d 216, 220 (2d Cir. 2004) (per curiam). Similarly, after <u>Booker</u>, the Second Circuit held that a district court's refusal to adjust a sentence to compensate for the absence of a fast-track program -- in which the government offers defendants in certain districts charged with certain crimes favorable dispositions in exchange for early guilty pleas -- does not render the resulting sentence unreasonable. <u>See</u> <u>United States v. Mejia</u>, 461 F.3d 158, 164 (2d Cir. 2006). The import of these decisions is that the Court should not tailor a defendant's sentence to match that of specific defendants in an unrelated case, where case-specific charging decisions or district-specific policies may have played a role. Conforming the sentences imposed in this case to those imposed in Maryland would increase unwarranted disparity, not reduce it. One recent study concluded that the most common sentence for defendants convicted under Section 2339B was 180 months, the statutory maximum, and that the average sentence was between 118 and 123 months. <u>See</u> Robert M. Chesney, <u>Federal Prosecution of Terrorism-Related Offenses: Conviction and Sentencing Data in Light of the "Soft-Sentence" and "Data-Reliability" Critiques</u>, 11 Lewis & Clark L. Rev. 851, 885 (2007) (analyzing all sentences imposed by time of publication for convictions under Section 2339B in cases charged between September 2001 and July 2007).

### 7.    Other Section 3553(a) Factors

The other factors identified in 18 U.S.C. § 3553(a) are not relevant to the case at hand. <u>See</u> 18 U.S.C. § 3553(a)(5) (pertinent policy statements), 3553(a)(7) (restitution).

### III. <u>Conclusion</u>

For the reasons discussed above, the Court should impose a sentence between 40 years and life imprisonment on Thani and a sentence between 35 years and life imprisonment on Satha. The Court should impose a Guideline sentence of 30 years, the

27

statutory maximum, on Yoga.  The government does not oppose a non-Guideline sentence of less than life imprisonment for Sahil.

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney

By: _____/s/_____
Greg D. Andres
Marshall L. Miller
Andrew E. Goldsmith
Assistant U.S. Attorneys
(718) 254-6421/6273/6498

cc:  Lee A. Ginsberg, Esq. (by ECF and electronic mail)
     Anthony Ricco, Esq. (by ECF and electronic mail)
     Bobbi C. Sternheim, Esq. (by ECF and electronic mail)
     Steve Zissou, Esq. (by ECF and electronic mail)
     Frank M. Marcigliano Jr., U.S. Probation Officer (by facsimile)