**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

**UNITED STATES OF AMERICA,**


**- against -**


**PIRATHEEPAN NADARAJAH**


**Defendant.**
-------------------------------------------------------------X


**SENTENCING SUBMISSION**



**Cr. 06-615 (RJD)**




**SAM A. SCHMIDT, ESQ.**
**Attorney for Defendant,**
**Piratheepan Nadarajah**
**111 Broadway, Suite 1305**
**New York, New York 10006**
**(212) 346-4666**

**TABLE OF CONTENTS**

**Objections to the PSR**........................................................................................ 6

Piratheepan "Peter" Nadarajah Was Not "A" or "The" Technical Expert...... 9

Piratheepan "Peter" Nadarajah Was Never Known as "Nada"....................... 17

Mr. Nadarajah Knew That He Would Be Refused Entry
Into the United States................................................................................... 17

Nanthini Nadarajah Obtained Her Brother's Passport
Late Afternoon on August 18, 2006 ............................................................. 19

So What Is the Purpose of These Objections?............................................... 19

Peter Nadarajah Would Never Knowingly Assist in
Purchasing Weapons to Shoot Down Airplanes........................................... 20

**A Sentence of Time Served Is "Sufficient but Not Greater
than Necessary to Achieve the Sentencing Purposes Set
Forth in *18 U.S.C. §3553(a)(2)* and *United States V. Booker,*
543 U.S. 220 (2005), and its Progeny**..................................................... 21

Offense Conduct.......................................................................................... 21

Peter's Personal History and Characteristics of Peter Nadarajah.............. 21

Childhood in Sri Lanka................................................................................ 23

Life in Canada............................................................................................. 24

Service and Assistance to his Family Friends and his Community............ 30

Continued Service and Education During His Incarceration...................... 32

Efforts Towards Reconciliation.................................................................. 33

i

The Need for Peter's Return To Care for His Son and His Family............... 37

The Automatic Application of the Guidelines' Terrorism ............................ 40
Enhancement Should Be Remedied By Resort to the §3553(a)
Sentencing Factors and Departure Law

Increasing Peter's Criminal History Category From Category I
to Category VI Grossly Overstates His Criminal History............................ 43

The Need to Avoid Unwarranted Disparities................................................ 46

The Need for Adequate Deterrence, the Protection of the
Public and Provide Just Punishment............................................................. 47

Death of Peter's Brother Jegan in Sri Lanka................................................. 49

The Need to Provide the Defendant with Needed Educational
or Vocational Training, Medical Care, or Other Correctional
Treatment in the Most Effective Manner....................................................... 50

Sentences Available....................................................................................... 51

**The Government's Failure to Modify Its Record of the Case for
Extradition and Untimely Production of *Brady* Material**................................. 51

**Conclusion** ................................................................................................. 53

**LAW OFFICE OF SAM A. SCHMIDT**
THE TRINITY BUILDING
111 BROADWAY
NEW YORK, N.Y. 10006
(212) 346-4666
FACSIMILE (212) 346-4665
e-mail Lawschmidt@aol.com


**Sam A. Schmidt, Esq.**
_____
Shameeda Mohammed, *Paralegal*


January 31, 2014


Hon. Raymond J. Dearie
United States District Court
225 Cadman Plaza East
Brooklyn, N.Y. 11201


Re: *United States v. Nadarajah* Cr. 06-615 (RJD)


Dear Judge Dearie:

Piratheepan "Peter" Nadarajah will come before your Honor facing a maximum sentence of thirty (30) years and a Guideline range of 360 months - thirty years in jail because he was convicted of two offenses that are described by federal criminal law as terrorism offenses. Fortunately, as a result of *United States v. Booker*, 543 U.S. 220 (2005) and its progeny, the principles guiding sentencing courts' obligations and authority in determining the appropriate sentence have developed in a manner more consistent with the statutory mandate of 18 U.S.C. §3553(a)(2)'s "parsimony clause": that a sentence should be "sufficient but not greater than necessary" to achieve the purposes of sentencing enumerated in §3553(a)(2)(A)-(D). This submission will set forth our objections to the presentence report ("PSR") and the reasons why a sentence of sixteen (16) months - a sentence that equal to the time served in Canadian and American detention facilities - is the appropriate sentence for this defendant, Piratheepan "Peter" Nadarajah and for the circumstances of this case.

1

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**  *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                              **06 Cr. 615 (RJD)**

Our request is supported by many factors. Among them are:

1.  The history and experiences of the Tamil minority under the majority Sinhalese government subsequent to the independence of Sri Lanka;

2.  Peter and his family's background in Sri Lanka and the hardships during his adolescence in Canada;

3.  Peter's achievements as a person and a member of his community notwithstanding numerous hardships;

4.  Peter's generosity as demonstrated by his service to his various communities, neighbors, colleague and family;

5.  Peter's extraordinary efforts to assist in the reconciliation of the Tamil community in Canada and Sri Lanka with the Government of Sri Lanka ("GOSL") and the Sinhalese majority;

6.  Peter's indispensable role in his family's continued emotional and financial including the needs of his son;

7.  Peter's sincere and heart felt remorse for his conduct;

8.  Peter's his material support for the LTTE was limited in time and scope particularly as compared to those in the instant and related cases;

While we have great respect for the work of the Department of Probation and specifically, USPO Frank Marcigliano, and its recognition of Peter's sincere and significant efforts and his dedication to the peace and reconciliation process,

2

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                          **06 Cr. 615 (RJD)**

to our dismay, the PSR recommended a sentence of ten (10) years in jail. My
disappointment is diminished by my understanding of the basis of this
recommendation,  the desire to assure that Peter's sentence is "commensurate with
others imposed in this case."  We believe that basing its recommendation on the
need to impose a sentence "commensurate with others imposed in this case"
unduly and improperly limits the scope of the appropriate sentence and violates
the principles expressed by the Supreme Court in *Gall v. United States,* 552 U.S.
38, 128 S.Ct. 586  (2007), *Kimbrough v. United States*, 552 U.S. 85, 128 S.Ct. 558
(2007),  *Spears v. United States*, 555 U.S. 261 (2009) and most recently *Pepper v.
United States* 131 S.Ct. 1229 (2011), as well as by the Second Circuit in *United
States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010).  As set forth above and *infra*, the
are many 3553(a) factors that support a sentence of sixteen (16) months.

Equally important, is that the recommendation incorrectly assumes that Mr.
Nadarajah offense conduct was not the acts relating to the purchase of night vision
goggles and cellular telephones and the last minute travel with the other
defendants to the U.S. border with the understanding that the trip was to assist the
LTTE in some way, but participating in the conspiracy to obtain guided missiles
for the LTTE as the technical expert.  For good reasons, as explained *infra*, the
Government has acknowledged its inability to prove by **a preponderance of the
evidence** that Mr. Nadarajah was a technical expert. Thus, the recommendation is
based upon faulty assumptions and inaccurate factual allegations.

While we acknowledge that the Indictment under which Peter pled guilty
contains counts directly related to obtaining guided missiles, we dispute that his
sentence should be commensurate with those sentenced under this Indictment for a
number of reasons that include his background, character,  achievements, family
circumstances, recent activities while incarcerated in MDC,  his lack of knowing
involvement in the missile part of the conspiracy and his extraordinary efforts in
working for reconciliation between the Tamil and Sinhalese people, as well as
with the government of Sri Lanka. Even the Government has recognized that
proportionality of sentences requires a comparison of the sentences of those, not

3

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                     **06 Cr. 615 (RJD)**

necessarily charged in the same indictmen,t but with those whose conduct was similar. *See* Sentencing transcript Pratheepan Thavaraja Sept. 6, 2012 at 33-34. A31-32.

Both Mr. Nadarajah and I are fortunate that it will be your Honor who will determine the appropriate sentence for this matter. I am fortunate because I will not need to repeat and reargue the history of the prolonged and bitter struggle in Sri Lanka between the Tamil people and the Government nor persuade your Honor of its significance.  I have familiarized myself with the available transcripts and your Honor's decisions in this and the related case.  Rather than duplicate the efforts of other counsel in this case, Cr. 06-615, and the related case, Cr. 06-616, I adopt the relevant submissions and presentations. Reference to the conflict will be limited to its impact directly on Peter and his family.[1]

I have also reviewed the recent decision by the Second Circuit in *United States v. Pratheepan Thavaraja*, Docket Number 12-4330-cr that affirmed the "thoughtful and principled consideration by a conscientious district judge of all factors relevant to an individualized determination of a fair and just sentence. " At page 22. While Mr. Pratheepan's offense conduct was of much longer duration and of much greater magnitude that of Peter Nadarajah, it is my hope that many of the legal issues raised by the Government at his sentencing and on appeal are settled and will no longer need to be discussed in this sentencing submission. It is already longer than I had hoped.

Therefore, my failure to repeat the information found in the prior submissions and presentations should not be viewed as a denial by Peter Nadarajah or myself of the brutal and criminal actions of both the LTTE and the Government of Sri Lanka nor a denial of Peter's understanding and sincere

---

[1] Because of the number of documents that will accompany this submission, I will be submitting an appendix instead of individual exhibits. The pages will be referred to "A" followed by the page number. Additionally, without meaning to be disrespectful, I will be referring to most of the actors by their "short" names.

4

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                    **06 Cr. 615 (RJD)**

remorse of his involvement in assisting the LTTE in obtaining night vision goggles and other paraphernalia and obtaining cellular telephones for supporters of the LTTE. Simply, I am relieved that I do not need to carry the burden that so many able attorneys have carried before me.

It is my educated guess that the Government's submission will not dispute the information relating to Peter's background found in the PSR, this submission and the myriad of letters from all those who pray for leniency and compassion for Peter. The letters are from family, friends, coworkers and community members; from those who have worked with Peter and those who socialized with him; from those who have known him for most of his life or those who know him for just a few years; from those who are Tamils of the Hindu faith, Sinhalese of the Buddhist faith and Canadians of a multitude of religions.

It is also safe to assume that the Government will not dispute the sincere and significant efforts that Peter Nadarajah has made to assist in the reconciliation between Tamils and the Government of Sri Lanka as evidenced this submission and by documents submitted to your Honor.

Peter, of course, does not dispute that others charged under the instant Indictment made serious efforts to obtain guided missiles and other armaments from government agents posing as arms dealers.[2] He does not dispute that he assisted others who were long time activists and supporters of LTTE to obtain night vision goggles and other such material for delivery to the LTTE.[3]

---

[2] We do believe that the mandatory sentences were unduly harsh and not within the requirements of present case law relating to the factors set forth in 18 U.S.C. § 3553. This is another reason why the sentences of the codefendants should not be a factor in the determination of the appropriate sentence for Mr. Nadarajah. It should also be noted that it is my understanding that had the codefendants accepted responsibility for their conduct in a timely manner, a plea without a mandatory sentence appeared to be available.

[3] LTTE was not designated to be a terrorist organization in Canada until April 2006. While Peter's assistance began before that time, he continued to assist after LTTE

5

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                      **06 Cr. 615 (RJD)**


But we will demonstrate that though Peter did assist the others, he was not a long time supporter nor activist as were the others. Most importantly, we will demonstrate that Peter Nadarajah did not and would never knowingly assist anyone to obtain weapons, especially weapons designed to shoot down airplanes. Thus, we will dispute many of the claims that appear in the PSR and other submissions that Peter Nadarajah was a knowing participant in a conspiracy to obtain or an attempt to obtain guided missiles. We will demonstrate that Peter Nadarajah's sentence, with consideration of all of the 3553(a) factors, including his personal characteristics and reconciliation efforts,  should not be commensurate with those convicted under the instant Indictment but as a starting point before consideration of his individual history and characteristics commensurate with those involved in other conduct, perhaps like those sentenced in the companion case or in cases in other districts.

**OBJECTIONS TO THE PSR**

Before our discussion of the factors found in 18 U.S.C. § 3553(a), I must first set forth our objections to the factual allegations found in the PSR. Knowing that the burden of proof in merely a preponderance of evidence, the limited resources and authority of the defendant as compared to the Government, and the difficulty in proving the negative, I am fully confident that the evidence and the lack of evidence would be sufficient to demonstrate that our objections are meritorious and the PSR should be so modified.

---

was so designated. Among those involved in these purchases were codefendants Thanigasalam (Thani) and Sabaratnam (Sahil), and a person not charged, Ganeshkumar Subamaniam ("Ganesh" or "Bugs" or "Bugsy").  It also appears that though the purchased night vision goggles were supposed to be the newer Generation III version, the seller sold them the Generation II version claiming it was Generation III. *See* #25362 August 19, 2006 transcript of meeting between codefendants and undercover agents. The transcripts have been provided separately. This transcript was previously submitted as Government Exhibit E July 24, 2009, docket 257-6.

6

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**    *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                          **06 Cr. 615 (RJD)**

The abbreviated version of Peter's position of his involvement in the instant offense can be found at paragraph 65 of the PSR.[4] The first Addendum provides only a conclusory statement of our objections and our efforts to support the objections. However, in the First Addendum, P.O. Marcigliano made an interesting and important observation when noting that the defense objections are "seemingly well-reasoned" but were rejected because it is "based on what information is not there." As we will set forth, much of the evidence that was "not there" is the result of the inexplicable lack of corroborating evidence that one would expect to exist to support the Government's original version, the inconsistencies in the evidence that does exist and very recently in its *Brady* letter, the Government's acknowledgment of its inability to produce sufficient credible and reliable evidence to support its original version of Peter's conduct.

There is, however, enough evidence that "is there" to demonstrate Peter's position - he was not and never was a "technical expert," and was a last minute addition and perhaps even a replacement for Ganesh Subramanian. Further, the evidence demonstrates that though Peter ultimately learned that the trip to the United States was taken for the benefit of the LTTE, he was unaware of that the trip was to obtain guided missiles or other armaments.

The Government's January 9, 2014 letter to Frank Marcigliano, USPO, A1. in response to our objections concedes a very significant point but does not directly respond to many of our objections. Of course, we do not dispute that the codefendants referred to Peter Nadarajah as a 'technical expert" at the August 19,

---

[4] The only part that we asked to be modified in that paragraph is that after Peter was asked to obtain telephones for Ganesh and Thani, he received a telephone call from his brother, now deceased, who told him, in substance, that if you (the defendant) can help them without getting yourself in trouble, do so but be wary of LTTE supporters. At this time, the LTTE was not on the Canadian terrorist list. It was unsettling to Peter, he said to me he was "freaked out" that these persons knew who he brother was and had an LTTE representative contact his brother to have him call.

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                     **06 Cr. 615 (RJD)**

2006 meeting. The words are memorialized in a recording. However, we may dispute the Government's extraordinary vague statement that Mr. Nadarajah made "considerable efforts to attend this meeting." Yes, he had his sister obtain his passport after he was asked that Friday, August 18, 2006,by Thani to accompany him to the United States even after Peter told Thani that it was unlikely he would be admitted. Yes, Peter drove with the others from Toronto to Niagra Falls, an 80 mile drive of approximately one and one-half hours. If this is the "considerable efforts to attend this meeting" the Government alleges, we do not have a dispute. If there are other "efforts" alleged by the Government, we may dispute its claims.

Most importantly, however, the Government acknowledges that it is unable to prove by a **preponderance of the evidence** that Peter Nadarajah is, in fact, a technical expert. While it is extraordinary that after seeking and obtaining extradition of Peter from Canada after six and one half years as **the technical expert** and claiming that he was referred to as the "partner" responsible for the technical side" and was referred as the technical expert in telephone calls prior to the meeting in the complaint and the extradition documents, the Government now admits it cannot prove by the low threshold that he was "a technical expert" and he was not the person referred to in the prior telephone calls.

Since the Government has not responded with specificity to my objections and to our factual recitation with evidentiary and common sense support, we believe that the Government cannot and does not dispute our other objections Thus, it appears that the Government concedes that Satha's post arrest statement as it relates to Peter is another one of his many lie; that at the August 19, 2006 meeting, the codefendants were puffing, lying and merely trying to make it appear that they had "real" experts and a scientist coming to the meeting knowing that it was not true; and that Peter was indeed,  a last minute addition to the trip without knowledge of its specific purpose.  However, because of the vagueness of the Government's response and that the PSR was left unchanged except for an additional addendum, this submission will include the argument and support for our position.

8

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                      **06 Cr. 615 (RJD)**

## Piratheepan "Peter" Nadarajah Was Not "A" or "The" Technical Expert

The basis of the claim that Peter Nadarajah was a , or the technical expert rests solely on the statements made by the conspirators while in New York that the person who was unable to enter the United States with them was the technical expert.[5]  The Government can no longer defend the statements about Peter by the codefendants as truthful or accurate. They were lies simply to make it appear that they were serious and well prepared to negotiate and purchase missiles.

During the discussions relating to the missiles, the confidential informant ("CI" though sometimes referred to as a CW) and an undercover agent ("UC") repeatedly made it clear that they did not want to waste their time and that Sathi and his team had better have the technical expertise. *See e.g.*  Transcript of July 31, 2006 #55783 at page 6. It was just as clear that the one with the technical expertise was Thani.  In the August 14, 2006 telephone call between Satha and the UC, the UC told Satha "don't waste my time" and asked at least three times "if you're serious, "I need to know you're serious."  Transcript of August 14, 2006 #55921. *See also* Conversation between CI and Satha on August 16, 2006 #55939(CI: In order to acquire this we should convince him. He (UC) thinks we are not serious**)** and August 13, 2006 #55912 (CI: .... He said we shouldn't do it without being serious.[6]

Peter simply became a convenient excuse should the others not be able to demonstrate the necessary expertise.  Other evidence, both direct and

---

[5] The statement in the complaint at page 12 paragraph 20 that Piratheepan Nadarajah aka "Nada" was the technical expert relies solely upon the same statements at the August 19, 2006 meeting and  Satha's post arrest statement, and not with the actual use of Mr. Nadarajah's name, the name "Nada" or any other identifying factor.

[6] See also 55897 August 9, 2006 to Satha "CW: If we are doing it we must talk seriously we him." 55913, August 14, 2006 to Satha "CW: ...the main thing is that we have to convince him if we are serious or not."

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                      **06 Cr. 615 (RJD)**

circumstantial, corroborate our position that Peter was a last minute substitution and did not have any technical expertise. And the Government provided no corroboration of the statements made by conspirators who, as they have regularly pointed out, lied, perjured themselves and simply made up false stories from whole cloth.[7] Their January 9, 2014 response to our objections confirms that the Government does not accept the statements of Satha and the others that Peter Nadarajah was "a" or "the technical expert" as credible or accurate.

In its January 9, 2014 "*Brady*" letter, the Government has provided Thani's post plea statement at his October 15, 2009 proffer that corroborates our position

> On or about October 15, 2009, Thanigasalam stated the following, in sum and substance: In approximately January 2006, Thanigasalam agreed with others to purchase night vision equipment on behalf of the LTTE. Thanigasalam called the defendant, who worked for Rogers, Inc. Thanigasalam provided the defendant with all information regarding the products Thanigasalam intended to purchase and told the defendant that the night vision equipment was for "back home," meaning for the LTTE. Outside of Thanigasalam's workplace in Mississauga, Thanigasalam provided money to the defendant to purchase the night vision equipment. Thanigasalam never discussed with the defendant how the defendant had got around the purchase restriction.
>
> ...
>
> On the day that Thanigasalam and Sarachandran traveled to New

---

[7] Specifically we object to paragraph 14 and the sentence that "Nada was an LTTE supporter and a technical expert who was going to be present at the meeting to inspect the weapons and provide his expert technical advice on the merchandise." We also object to same information found in paragraph 19.

10

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**    *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                   **06 Cr. 615 (RJD)**

> York – to look at but not to purchase weapons – Thanigasalam called the defendant at approximately 11 a.m. and informed him that he was going to the United States. Thanigasalam also told the defendant that someone there might be able to bring the defendant's brother to the United States. Thanigasalam stated that the defendant did not know about the weapons deal and that the defendant was never told about the weapons. The defendant told Thanigasalam that he might have a problem crossing the U.S. border. Thanigasalam decided to invite Sahilal Sabaratnam on the trip so that, if the defendant were denied entry into the United States, Sabaratnam could remain with Thanigasalam.

A2-5.  In telephone conversations with me and in an email, Thani confirmed the accuracy of the October 5, 2009 statements to the Government.[8]

In support of the claim that Peter was the technical expert, the PSR cites the post arrest statements of Satha.  In fact, for different reasons, Satha's post arrest statement and even that of Thani, actually provide support for our position, for there is additional evidence that the statements relating to Peter are fabricated. PSR ¶¶ 24 and 36-39.

Notwithstanding his claim that he emailed "Nada" on August 14 and 15, 2006, there is no record in the discovery material provided by the Government of any email being sent by Satha to Peter nor is there any evidence of an email of "Ragulan" writing Satha to require him to contact Peter or identify him as a technical expert. Unfortunately we only learned of the alleged emails as a result of the PSR. Thus, Peter did not make any effort to save his emails from that period of time and the server company was changed. We have been unsuccessful in locating his emails from August 2006. We are also unaware of any efforts by the

---

[8] Thani indicated that the last sentence should more accurately be that Sahil would remain with Thani and Satha.

11

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                                **06 Cr. 615 (RJD)**

Government to obtain Peter's emails or make any attempt to corroborate or contradict Satha's statement.  Additionally, after his arrest and when asked by an agent of the RCMP for his email address and password, Peter provided it.

The Government did obtain Peter's telephone records for August 14 and 15 which do not do not include any calls to or from Satha.  Satha's telephone records, however, demonstrate a 6:47 minute call between him and the undercover starting at 19:53:55 (7:53 PM) with the consensually monitored telephone call and draft transcript confirming the call.  The first call made by Satha after he completed that conversation with the undercover agent was to  Ganesh Subramaniam at 20:11:38 (8:11 PM) for 1:49 minutes, the same person who received telephone calls from the conspirators during the August 19, 2006 meeting with the undercover agents and the CI.

Corroborating Peter's denial of ever receiving or sending an email, meeting or talking to Satha on August 14 and 15 is the Government's own submissions and the surveillance of the RCMP. In its July 22, 2009 letters to P.O. Marcigliano in relation to the PSRs of Satha, Sahil and Thani, Docket 253-255,  the Government acknowledged that it was Thani that Satha was talking about in his conversation with the undercover agent **and it was Thani that he met after the conversation not Mr. Nadarajah.**[9]

> In paragraph 13, the PSR references a recorded telephone call on August 14, 2006 between Satha and the undercover law enforcement officer who posed as a black market arms dealer (the "UC"), during which Satha and the UC discussed the final stages of the arms deal and arrangements for Satha and his coconspirators to inspect the missiles and other weapons. In

---

[9] It appears undisputed that Thani held a position of significance importance in relation to his contact with the LTTE.  It was Thani who traveled to Sri Lanka to meet with the Supreme Leader and others to discuss the costs and technical aspects of what was needed.

12

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                               **06 Cr. 615 (RJD)**

> addition, also in paragraph 11, the PSR indicates that officers of the Royal Canadian Mounted Police (the "RCMP") performed surveillance of Satha meeting with defendant Thani in Toronto on the same day. In the government's view, this telephone call and meeting warrant further discussion as they are directly linked. During the telephone call, referring to defendant Thani's return the day before from a trip to Sri Lanka to gain approval for the weapons transaction from LTTE leadership, see PSR, ¶ 11, Satha described his "partner" who "arrive [sic] right now from the other countries," and told the UC, in sum and substance, that he was going to meet with his partner "tonight." See Transcript of August 14, 2006 telephone call, attached as Exhibit D, at 3, 5. As a result of the conversation, agents of the Federal Bureau of Investigation's Joint Terrorism Task Force ("JTTF") asked the RCMP to perform surveillance of Satha to determine if he met with anyone. Soon thereafter, RCMP officers performing surveillance that evening observed Satha and another individual enter a Ford Escape registered to Thani - the same car that Thani, Satha and codefendant Sahilal Sabaratnam ("Sahil") drove to New York to engage in the weapons transaction.

July 22, 2009 Gov't Letter to USPO Marcigliano, pp. 2-3, document # 255. *See also* Gov't December 21, 2009 letter about Thani. This information provides a more expansive and accurate account of the information found in paragraph 13 of the PSR. Indeed, Satha told the undercover that the "other guy," meaning the person he was meeting that night, "is more in the technical part." As the RCMP discovered, that person was Thani.[10]

---

[10] The telephone records of Mr. Nadarajah received in discovery include the cell tower locations of the calls made by Mr. Nadarajah including on August 14 and 15, 2006. Satha's telephone records do not include cell tower information. Mr. Nadarajah lived and worked just west of Toronto while Satha lived east of Toronto. We are confident that if

13

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                                        **06 Cr. 615 (RJD)**

It is our belief that the third person who was to accompany Thani and Satha was to be Ganesh but he was unable to take off work. *See* Transcript of August 14, 2006 #55913. page 6. between CI and Yogarasa: "three people are coming." Ganesh was the person to whom the Satha called immediately after his conversation with the undercover agent on August 14, 2006 which is why we believe he was the third person at the August 14 meeting. He also was repeatedly called by the conspirators while they were in New York meeting with the government agents. *See* August 19 transcript of the meeting. Ganesh also has a Bachelor of Engineering Degree in Computer Systems Engineering from Carleton University.

In a transcript of a conversation between Satha and the CI at 2:31 PM on the following day, Wednesday, August 16, 2006 #55939,) Satha told the CI that there may be only 3 people going to meet the UC. p.7. This appears to indicate that Satha believed Ganesh was going to go. Thani was the one with the close connection to the LTTE leadership and had technical knowledge and training, and Satha was the coordinator. This is yet another confirmation that Peter was never the "technical guy."

Other consensual recordings further demonstrate that Thani was the technical expert. During the August 13, 2006 conversation between Satha and the CI #55912), Satha was asked by the CI to speak to the undercover agent to demonstrate that they were serious potential purchasers. Satha explained that "someone" - we now know the someone is Thani - went to Sri Lanka but had not yet returned (he returned the next day). Satha continued about Thani: "He will know the stuff. I am like you too. He is someone who knows the technical stuff...."

The Government's prior submissions relating to the sentencing of the codefendants and the instant PSR contain confirmation that Thani was the

_____

the cell tower records of Satha were available it would have corroborated that Mr. Nadarajah and Satha did not meet on August 14 or 15, 2006.

14

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**    *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                **06 Cr. 615 (RJD)**

technical expert. At the end of paragraph 37, Thani is described as "display[ing] a technical knowledge of weaponry on par with that of an expert..." and, at paragraph 38, "a comprehensive understanding of military arms and technology, and of the LTTE's military arsenal and arms procurement operation in particular, that went far beyond an 'engineering background."

It is also undisputed, as the Government repeated in its submissions, that "Thani demonstrated a level of expertise regarding weapons technology consistent with that of a seasoned arms dealer ...." Gov't December 21, 2009 letter about Thani at pp. 5-6.[11] The Government stated that "Thani also demonstrated a sophisticated knowledge regarding the weaponry, military tactics, procurement methods and training techniques of the LTTE.... *Id*. at 21. Thani received formal weapons training  and demonstrated his technical skills and knowledge. PSR ¶¶ 16-17.

Searches of residences and other information, including documents, information on electronic media and emails, demonstrate training and knowledge of weapons by Satha, Thani and even Sahil. *See* Gov't  December 21, 2009 and July 22, 2009  submissions.  Nothing belonging to Peter Nadarajah demonstrate any similar type of training and/or knowledge.  In was only at the August 19, 2006 meeting that Peter Nadarajah was described as the technical expert. p.55.

The transcript of the August 19 meeting reflect numerous examples that this statement was a lie to make it appear that these young men were capable of negotiating the agreement for missiles.  It was the CI who first raised the issue of someone being stopped at the border. Transcript,  August 19, 2006 p. 22.[12] In response to a question from UC1whether the person who was not allowed to enter

---

[11] See also the Government submissions on July 22, 2009 for all defendants at pages 3-4.

[12] During an earlier conversation that day, when the CW asked if everyone was there , Satha relied affirmatively and did not mention that Peter was stopped at the border.

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**    *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                    **06 Cr. 615 (RJD)**

was "the money guy" Sahil said "he's one of the experts. Put it that way." UC: The expert in the thing? Sahil: Well I mean, just the technicality of it - where he's (Thani) just as good as him." August 19 transcript at pp. 22-23. Later, UC1asked "why were you bringing him (Nadarajah), then? Thani responded "He's um - he's the technical guy like him, like him" and Sahil added [h]e's our scientist." *Id*. at 53. Peter is neither a scientist nor the "technical guy." Later the conversation demonstrated that the statements about Peter were undeniably false and that the codefendants did not want Peter called because it would show that they were lying.

| | |
|---|---|
| Thani: | ... actually he is the guy who used this stuff so... |
| UC1: |  He has- he has been in the war, he has used it? |
| Thani: | Yeah. |
| UC1: ... | What if you put him on the phone with this guy (our expert)? |
| Thani: | **No, no, no, no** phone call okay? Don't make any phone call. |

*Id*. at 54.[13]

---

[13] See also pp. 54-55.

UC1:  ...You know, I want you to be assured that your technical guy says 'yeah - these guys ain't full of shit', you know what I mean? That this thing, this really whatever Machs it makes, how fast it goes and all that bullshit.

Their response is

| | |
|---|---|
| SATHA: | Call Ganeshan |
| THANI: | Call Ganeshan |

...

UC1:  See if you can get this guy. Email him or text him or something. This is what we are going to do. Did you tell them that they may see it today?
CW:  Yes
UC1:  you wanna see it today?
ALL:  Yes
UCI:   but your technical guy is not here so what (UI)?
SAHIL: that's okay, he's just as good.
THANI: Don't worry

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**  *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                   **06 Cr. 615 (RJD)**

It is also undisputed that except for a texted "good luck" when he was on his way back to Toronto from the border, Peter did not have further contact with the others. Ganesh, however, was the person that Thani sought out for questions and assistance during the meeting with the UC.

**Piratheepan "Peter" Nadarajah Was Never Known as "Nada"**

In the Indictment and throughout the PSR, Piratheepan "Peter" Nadarajah is referred to as "Nada." Satha, who had no conversations except for an introduction, used the name "Nada." Peter Nadarajah has never been known as "Nada." His English name is Peter. We have attached fifty-eight (58) affidavits of family and friends who have known him under various circumstances for many years. A201-258. As they all note, he has never been known as "Nada." It also should be noted that Thani, a person that Mr. Nadarajah knew for approximately a year, when describing Mr. Nadarajah in his post arrest statement, called him Peter. Further, the entry for Mr. Nadarajah in Sahil's Blackberry is for Peter.

**Mr. Nadarajah Knew That he Would Be Refused Entry Into the United States**

As the Government submission for extradition from Canada reflects, Mr. Nadarajah was refused entry in 1996 because he admitted to a border officer that he had entered the United States previously with false documents. Of course, this is not the full story.

In late 1990, because of kidnaping threats from some liberation movements (including LTTE) to extort money from his well to do parents, at 14 years old he was sent by his parents to live with his brother Wickneswaran (Wicky) in Canada. He was sent to Singapore with strangers to meet an "agent." He stayed there for

17

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                    **06 Cr. 615 (RJD)**

two weeks.[14]   Fourteen year old Piratheepan was taken to China where he also stayed for two weeks, not speaking the language and being unfamiliar with the food and customs. At some point his papers were altered and then he traveled to Japan, fell ill and remained for another two weeks.  Finally, as he was put aboard an airplane to the United States, his passport and identification documents were taken from him leaving him with just his boarding pass in a different name.  He arrived in Los Angeles and fourteen year old Piratheepan told his story to the customs officials.  He was held in immigration custody until his brother was able to make arrangements for him to fly to Buffalo, N.Y. He was met there by his brother and taken to Canada.

When Mr. Nadarajah sought to enter the United States in 1992 to visit a close family friend, he was asked if he ever entered the United States before. He responded honestly and told the agent the story of his travels. As a result, he was refused entry. Peter attempted to enter the United States two more times and was refused entry. During his last attempt to enter in or about 2000, he was told by an agent that he would likely be able to resolve the problem and explained what form he needed to complete. Peter never prepared the form. Thus, he was aware, especially after the increased security resulting from the events of September 11, 2001, that there was no chance that he would be able to enter the United States.

When he was first told by Thani that they planned to enter the United States, Peter explained that it was unlikely that he would be able to enter the United States. *See* A3-4 January 9, 2014 *Brady* letter. Thani told Peter to get his passport and try. It is also likely the reason that Sahil was ask to come.

It is absurd to believe that Thani or Satha would rely on a person who almost certainly was going to be refused entry into the United States to be the "technical expert." Had Mr. Nadarajah been the technical expert that the group was relying upon, arrangements would have been attempted to meet in Canada. No attempt was made. Satha was the coordinator, Thani was the expert and the person

---

[14]  The separation from his family made him inconsolable. He refused to travel further forcing his brother Jegatheeswaran (Jegan) to fly to Singapore from Sri Lanka to console him and persuade him to continue his journey.

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**    *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                              **06 Cr. 615 (RJD)**

who met with LTTE officials in Sri Lanka,  Sahil (and perhaps Ganesh) was the financial expert - he was a banker - and Peter drove from Toronto to the border.[15]

### Nanthini Nadarajah Obtained Her Brother's Passport Late Afternoon on August 18, 2006

As confirmation of Thani's proffer statement and his statement to me, Peter's sister Nanthini Nadarajah, with whom he was living with, prepared an affidavit explaining that she was asked by her brother late Friday morning, August 18, 2006, to obtain his passport for him from the bank. She remembered this day because August 18 is the anniversary of her husband death. *See A34,* Affidavit of Nanthini Nadarajah.  *See also* A33,  telephone record of August 18, 2006, 15:46 from Peter and Nanthini's home number to Peter's office cell phone.  Had Peter been aware that he was traveling to the United States prior to that, he would have obtained his passport earlier in the week.

### SO WHAT IS THE PURPOSE OF THESE OBJECTIONS?

In late 2005, with a little pressure and encouragement, legally (in Canada) helped obtain cellular telephones to be used by LTTE supporters to communicate with LTTE supporters and members in Canada and Sri Lanka. Starting in February 2006, before LTTE was designated a terrorist organization by the Canadian government, with some additional pressure exerted by Thani and Sahil, and after being shown grisly and disturbing photographs of the aftermath of GOSL attacks on civilians who were killed by GOSL troops in the middle of the night in a border area between the GOSL and LTTE controlled territories, Peter knowingly and willingly assisted in the purchase of night vision goggles to be sent to the LTTE in Sri Lanka and continued to do so after LTTE was designated as a terrorist organization by the Canadian government.  On August 18, 2006, he also continued the drive towards the United States and tried to enter the United States with the codefendants believing that they were going to seek some type of aid for the LTTE, expecting it to be money.

---

[15] Because of the entry issues, just before they got to the border, Peter moved to the back seat and Sahil drove.

19

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**    *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                                **06 Cr. 615 (RJD)**

This is what Peter Nadarajah did. This is the offense conduct that should be considered when your Honor is determining the appropriate sentence for Peter Nadarajah. As will be explained immediately below, Peter would never knowingly assist in purchasing weapons especially not ones that could be used to shoot down airplanes. Thus, his sentence should not be "commensurate with others imposed in this case."

### Peter Nadarajah Would Never Knowingly Assist in Purchasing Weapons to Shoot Down Airplanes

While this case makes it clear that decent, hard working and intelligent persons under certain extreme and unique circumstances - here the suffering of the Tamil minority during the long civil war between the GOSL and the LTTE - are willing to purchase guided missiles to shoot down aircraft, Peter Nadarajah would never knowingly do so not only because his background and the person he is, but also because an event that occurred in 1998. As the PSR and this submission demonstrates, Peter and his family's history had difficulties with both the GOSL and the LTTE but was often able to work with both and often prospered. His father and one brother were anti LTTE.

In the early 1990s, Peter's brother Jegan, who resided in Colombo and was one of the two siblings that remained in Sri Lanka, sought additional business opportunities. He joined Chandrum Rutnam as one of the partners in founding a small airlines, Lionair. The main route was between Colombo and Jaffna. In 1998, the business was doing well. However, on September 30, 1998, one of its two planes, carrying 48 passengers and 7 crew members was shot down by what has been believed to be the LTTE. A35-41[16] Civilian flights were suspended for more than four years. This was a loss felt not only by Peter's brother Jegan but by Peter and their whole family.

---

[16] There are varying accounts of the number of persons on the airplane. The date of the attack has been variously reported for September 28 and September 30, 1998.

20

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**    *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                             **06 Cr. 615 (RJD)**

**A Sentence of Time Served Is "Sufficient but Not Greater than Necessary to Achieve the Sentencing Purposes Set Forth in** *18 U.S.C. §3553(a)(2)* **and** *United States V. Booker,* **543 U.S. 220 (2005), and its Progeny.**

This section sets forth the unusual and extraordinary circumstances that demonstrate that a non Guideline sentence of sixteen (16) months - time served - is the only appropriate sentence that is "sufficient but not greater than necessary to achieve the purposes of sentencing.  The number of people willing to make the effort to express their belief in Peter would be extraordinary by itself. The substance of the letters and documents explaining Peter's efforts and dedication to his family, his friends, his community, his heritage makes it even more extraordinary. How Peter is loved and respected is best told, not be me, but by those who know him best.

As his brother in law Ranjithan Camalalingam explains

> If I have to describe Piratheepan in one word, I would say he is a genuine person.  He always takes care of his family and friends before look after himself.  I have never seen a person who goes miles to help others. He always helps elders, friends and people in need in bad weather condition.   Since I'm part of his family, I can say that Piratheepan is one of the best Dad I have ever seen. Piratheepan ensures to give enough time to his son and be with him whenever he needs his dad. A58.

Or that Kathiramanathan Ganeshapillai writes "I have never seen him say "NO" for help. A158.

**Offense Conduct**

The offense conduct has been set forth in our objections to the PSR.

**Peter's Personal History and Characteristics of Peter Nadarajah**

This particular portion of a sentencing submission is important because it relates to many of the factors found in 3553(a).  It is important because it helps in understanding how a defendant became involved in criminal activity and what the

21

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                           **06 Cr. 615 (RJD)**

chances are that he will commit other offenses after the case is over. It is important because it helps the sentencing court understand whether the defendant fits within the large group of "mine run" defendants or is extraordinary in a good or bad way. Perhaps, most importantly, it may confirm a sentencing court's initial impressions of a defendant and its thoughts of what an appropriate sentence is, or it may cause a sentencing court to reevaluate its initial beliefs. It is my hope that this portion of Peter Nadarajah's sentencing submission either confirms your Honor's initial impression that a sentence that will send Peter back to his family, his friends and his community to continue the good he has done is the appropriate sentence, or in the alternative, it will cause your Honor to pause and reevaluate your initial impression and help decide that a sentence of sixteen months - time served - is the appropriate sentence.

Having previously been involved in Islamic terrorism cases, including a six month trial, as well as the related LTTE material support case, I was well acquainted with the enormous differences between the nature of "terrorism" cases and those charged with similar or the same offenses. From the beginning of my representation of Peter Nadarajah in April 2010, it was obvious that he was another decent, hard working, honest and caring young man of Sri Lankan Tamil background that have often appeared in the LTTE supporter cases. At first, I became aware of many of his personal history and characteristics through telephones, emails and a review of the documents, generally related to bail, filed in Canada. After he was extradited in December 2012, I learned more about him as a result of face to face meetings in the MDC and in preparation of my bail submission. While preparing for the potential trial, I learned a little bit more about Peter. However, it has only been in the last few months that I have truly understood who Peter Nadarajah really is, what his has done and what he is capable of. And as old and jaundiced I have become in my 39 years as a criminal defense attorney, I was singularly impressed.

After the Government agreed to allow Peter to plead guilty to the offenses he committed in Canada in satisfaction of the entire superceding indictment, I sought letters from his family, friends and associates in my effort to present a more complete picture of him. Having previous familiarized myself with the affidavits

22

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                    **06 Cr. 615 (RJD)**

in the Canadian bail applications and the letters in our bail application, I expected to see similar ones from a few more friends and family members and hopefully a letter relating to his work towards the reconciliation between the Tamil minority and the Sinhalese and GOSL.  Though I already had great respect for much of what Peter had done in the past few years, some of the letters and information I received surprised me and has caused me to develop an even greater respect for a young man who I already perceived as a decent, caring person who, in my presence often came across as anxious and needy. As your Honor will read in my words and, more importantly, in the words of so many others, Peter is in many ways a quiet, gentle and unassuming person - an ordinary person in many ways, but one who has made extraordinary efforts for others without seeking any benefit for himself. Now, and only now, do I seek something on his behalf, the opportunity to return home so he may continue to make a difference to so many people.

### Childhood in Sri Lanka

Piratheepan Nadarajah, like most Tamils in Sri Lanka, lived through a dangerous and difficult time when the GOSL oppressed the minority Tamil population and the circumstances that lead to war and terror. Being born into a family of hard working and relatively successfully merchants and entrepreneurs, Peter was fortunate in his early childhood to escape the poverty that so many other Tamils suffered. Peter was born in 1976 and lived in a predominantly Sinhala area where his father moved his family from a village near Jaffna, in order to start his own convenience store.   Peter played cricket and was friends with Hindu, Muslim, Buddhist and Christian children.  He studied in a Sinhala school and interacted with all ethnic groups without difficulties. Even when there was civil unrest and violence around him and his father's business was burned down a few times, he did not understand the reasons for it and thought that only small number of troublemakers were responsible for the turmoil. As a seven year old, he believed it was possible for to all live in harmony in a united Sri Lanka.

This changed in July 1983 - Black July. Among the devastation caused by the Sinhalese against the Tamils was the destruction of Peter's father's business and the murder of one of his Tamil employees. Though only seven, he remembers

23

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                            **06 Cr. 615 (RJD)**

the chaos and fear it caused him and his family.  The family moved to Jaffna where his father started over, selling agricultural products needed for farming.  His business grew and prospered when commerce between the regions reopened, ultimately becoming the owner of the primary chicken feed company in Sri Lanka with offices in Jaffna and Colombo.

In 1987, war again erupted and the family fled to their ancestral village outside of Jaffna, abandoning the Jaffna business. After a number of months, the family moved to Colombo where the business still operated.  After Peter's brother Jegan began running the Colombo business, the family returned to Jaffna, where Peter's father sought to reestablish his business. Unfortunately, the Tamil liberation movements sought financing in ways that included kidnaping members of wealthy families so Peter's family became a target. In late 1990, because of attempts to kidnap him, Peter, 14 years old,  was sent to live with his brother Wickneswaran (Wicky) who had moved to  Canada. *See infra* at page 18.  In 1991, his sister Nanthini was kidnaped by the LTTE and was released after the family paid the ransom.   She was then sent to Canada as well.

### Life in Canada

As the youngest son and having almost died from kidney complications, he was very attached to his mother.  Thus, after the difficult and frightening trip to Canada, Peter struggled emotionally. In a strange new environment.  As the PSR notes at ¶ 89, Peter went from an upper income environment in Sri Lanka, to a poverty stricken lifestyle in Canada.  He and his brother were unable to afford their own apartment.  They moved frequently to save money, living with different people in a difficult neighborhoods, sometimes changing schools or traveling greater distances and he was force to carry responsibilities he never had before.

This tumult, however, did not derail Peter. He focused on his studies and played cricket, becoming the captain of the cricket team that won championships. As  his good friend Piragal Thirugnanasundaram,  who fled Sri Lanka with his mother and brother in 1991 to live in the same difficult neighborhood, wrote

> Having been subjected to bullying and teasing by fellow
> students in school and having the need to fit in, I joined local

24

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                    **06 Cr. 615 (RJD)**

school clubs and it is through one of the clubs I met Peter. Peter's ability to quickly understand someone's needs/challenges, ability to reach out was very transparent at my first meeting with him. Although he was a newcomer himself, his fearless, yet caring and sensible personality earned him a lot of respect from me and many others who got to know him in school. Hanging around Peter, there was a sense of belonging, a sense of pride and moral boost to be around Peter at school.

Peter was respected by teachers and known to do well academically. We took pride in our academic achievements in high school and at many occasions Peter has tutored me in math which is my weakness and I have tutored him in English in return. We ended up taking many courses together and our friendship grew.

My mother who was very particular about who I befriend in and out of school and found Peter to be the only person she trusted. Over time Peter earned not only the respect but the status of a second son to my mother. The giving character of Peter was most admired by my mother. Earning the respect and trust of elders was no task for Peter. Eventually our families became good friends.

Our gathering at the coffee shop was our coping mechanism to the problems we endured as young and striving newcomers. It was also our way of preventing falling into the trap of peer pressure of getting into illegal activities. It is during these times; Peter has always highlighted the commitment he had towards his family. He often talked about earning dowry for his sister's wedding, supporting his family with day to day expenses etc. A133-134.

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                              **06 Cr. 615 (RJD)**

His high school guidance counselor, Jacqueline Robinson writes that Peter's commitment to school and the community did not end when he graduated.

> While in high school Peter was an active member of the school community. He was a leading member of Westview's championship cricket team and acted as a peer tutor for other students in math. Peter got along well with everyone and developed an excellent rapport with teachers, administrators and his fellow students. After he left Westview, Peter remained active in the Jane-Finch community, using his own time and money to establish and coach in a cricket program for youth in the neighborhood. A143.

And he worked while in school to help support his family. After his sister Nanthini (the one who was kidnaped in Sri Lanka) married, Peter moved in with her and her husband in 1994. During his final year in high school,

and his parents came to Canada and remained being fearful for their daughter. The youngest sibling, Subhasini (Suba), moved to Canada a year later, and all five ended up in the in a 2-bedroom apartment in Toronto. Peter, 19 years old and a freshman in college, had more responsibility for his sisters and his recently arrived parents.[17]

> , my brother, Piratheepan
> was my only support. He gave me a shoulder to cry on and constantly provided moral support to keep me going. Whenever

---

[17] From 1994 to 1998, senior year at high school through college, Peter worked at a Petro Canada gas station, starting as a cashier, becoming the store manager and eventually the manager of four stores. At the same time, he delivered newspapers for Metro Today newspaper, working in the early morning hours. *See* also Piragal's letter. A134.

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**    *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                            **06 Cr. 615 (RJD)**

> I lost hope, he always tried to reassure me and promised that
> he'll be there for me forever.[18] A55.

That he was actually in college was an great accomplishment. With his hardships and everything happening in his family in his senior year, Peter did not think about continuing his education. However, his school's guidance counselor, Ms. Robinson, intervened. She paid for his application fee to Seneca College to help him obtain a two year degree as an Electronic Engineering Technician. He has never forgot what Ms. Robinson did for him and remained in contact with her ever since.

Though Peter worked part-time in evening and night to pay for his studies and support his family, he found time to give back to his community as a cricket coach and as a volunteer for many programs especially to assist the elderly. It took him four years to compete the two year program, but he graduated from Seneca College in 2000. With encouragement form his professors, Peter enrolled at the University of Toronto in 2001. Because he was working full time and was focusing on supporting his family and helping his community, he was unable to complete his studies and left the University in 2003. But he had a desire to learn and better himself. He completed an early childhood studies program and received a diploma at Royal Thompson. And he continued to coach cricket and volunteer in the community.

---

[18] Peter kept his promise to his sister who has never remarried. She prays for Peter's return home.

> After his marriage to his wife, Jenitha, they both decided to live in the
> same house with me. It helped me see life with a new sense of
> optimism, something I had difficulty doing since the loss of my
> husband.
>
> My brother's unfortunate situation has made me lose all my hope for a
> peaceful life ahead. I beg you to consider his family and give him a
> second chance. A second chance for him also means a peaceful life
> for his wife, his child, and myself. Please help me in continuing to
> see a purpose in my life. A55-56.

27

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**  *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                 **06 Cr. 615 (RJD)**

Peter's work ethic and his desire to better himself, his family and community did not stop there.  He worked while in school and then after school. He secured a full-time Technical Support position with IBM Canada and left for a better opportunity at Bell Canada. Bell Canada sent him to George Brown College, to learn new skills. In 2001 Peter was hired by Rogers Wireless Telephones to Go, where I stayed until 2010 starting as a Wireless Technician, becoming Project Manager for Base Station, then heading Research and Development for Base Station (cell phones), then as the Head of Fraud and Prevention, and finally as the Sales Manager. He not only proved himself a great employee but earned the respect and admiration as a person. In 2006, after his arrest, his employer of five years, George Brody was one of many sureties for his release on $700,000 bail during the pending of the extradition proceedings in Canada. Mr. Brody writes that

> Over the years, Peter has demonstrated a great level of responsibility and commitment towards his work and has earned my trust and confidence.   Peter's compassionate and caring attitude has allowed him to succeed in the business.   His honesty towards everyone around him has undoubtedly earned him respect with his customers as well as colleagues.   A140.

Mr. Brody's wife, Edith Klein, a senior administrator and lecturer at the University of Toronto, explained why Peter went from just an employee of her husband to a personal friend, even though coming from very different backgrounds, cultures and generations.

> Like all of Peter's friends, I am only too happy to testify to Peter's sense of integrity, honesty, and intelligence.   Peter is a genuinely kind and gentle person who is generous with his time and attention.   I feel proud and lucky to be his friend.  A141.

Virgina Francey considers herself to be Peter's "office Mom" expressing pride in his hard work both in and out of work. As a mother of four children of similar age as Peter, she recognized that he

28

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                      **06 Cr. 615 (RJD)**

> is one of the most reliable, conscientious, polite and honest young men that I have met....  Peter has always stood out there at the top along with my children.  His values, beliefs, professionalism, excellent manners and love of sports has only shown that his parents did a wonderful job of nurturing Peter to the young man he is today.
>
> ...
>
> In closing if there was one wish a mother could get granted it would be that Peter's troubles would all disappear.   I know of no other person that has learned the lesson the hard way.  'Remember you are a reflection of the company you keep.'
>
> A person's time is a precious gift and Peter is extremely generous with his time to befit others.  Be it at work, at the temple or at the cricket field. A138.

Proud to have inherited the entrepreneurial spirit from his father, Peter started other business ventures, while working full time.  In 1997, he started a Tamil movie rental store with three partners in the Jane and Finch area.  With partners who had technical skills to complement his business skills, he bought VibeMedia, a small web designing business called and expanded into e-commerce solutions.  Unfortunately, he had to leave the business after his arrest since the their largest potential customer, TD Bank, would not contract with someone with criminal charges pending. Later, with partners in 2010, he started Bell Telephones To Go. He had the experience in the industry.   The business failed after Peter's incarceration at the end of 2012.  Even with all of his responsibilities, Peter also found time to mentor others in their business ventures.

As many letters from friends demonstrate, Peter has earned the respect and admiration of not only those in the Tamil expatriate community but from Canadians of every ethic and religious background. Particularly significant are letters from two friends of many years who identify themselves as Sinhalese Canadians. Manjula Wijesinghe considers Peter "a brother kind of friend" who is important to th Canadian Sinhalese community as a result of Peter's community

29

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**    *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                **06 Cr. 615 (RJD)**

work. He notes that they became friends more than ten (10) years ago during, the conflict and believes that Peter is needed in the community to "tighten the bond between Tamil and Sinhalese communities in Canada." A161. Chandrapala Wijayawickrama, a man of mixed Sinhalese and Tamil heritage who identifies himself as Sinhalese, knows Peter from 1995. Peter encouraged him, like he did with so many other friends, to open his own business and help make it thrive. A162. *See also* Letters of Thurga Rajakulasooriyar and Paranthaaman Krishnapillai. A152, A145.

### Service and Assistance to his Family Friends and his Community

The work that Peter has done to assist in the reconciliation of the Tamil community with the GOSL and his hope to continue these efforts are of great significance and will be addressed below. These efforts, however, were not the result of a new found need for service to his community nor to provide another reason for leniency and mercy. It is simply the result of who he is as been expressed in the countless letters from friends and family. He has helped family, friends, neighbors and strangers since he was a child.

As noted *supra,* even as a teenager he helps other children and his family. His assistance can be as mundane as being a good neighbor as his 73 year old neighbor John Thomas Smith writes, whether it was to "take the time to converse or even just hangout," shovel the snow from his walkway and driveway or knowing Mr. Smith's love of ethnic food, bringing some new dish for him to try. To Mr. Smith, it is in Peter's "nature to go the extra mile with friends." A137. Or his efforts can be the long term commitment to his community as described by Nalini Muthulingam, the President of the Organization of Canadian Tamils with Disabilities ("OCTD"). Mr. Muthulingham writes that Peter has been an active volunteer with OCTD since 2001 and has assisted in various ways including developing a membership database, organizing events and simply transporting members and attendees to events. A73.

Peter's character can be demonstrated by such a simple kindness as coming to the aid of his office Mom, Virginia Francey, when she was in a car accident, taking pictures of the scene and getting her home. A138-139. Or it can be more

30

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                          **06 Cr. 615 (RJD)**

community oriented as explained by Juanita Nathan, a social worker, youth counselor and Public School Board Trustee, who has worked with Peter for the past seven years work including "coordinating blood clinics, walk-a thons benefitting local hospitals and a clothing drive for Haiti." A79. *See also* letters of Sureshwaren Poopalasingham,  Chief Priest Bhaskaran Sathiyanathan, Nithiyananthan Ganeshan, Nathan Sritharan, A74-78.

As one would expect from a person who have been described by so many friends, neighbors and associates as a loving and caring person, Peter has never hesitated to help his family in any way he could. As noted *supra*, he worked to help support his family in high school and college and kept his promise to his sister, Nanthini.  He has done simple things like surprising his younger sister Suba, who had just married and moved from her family for the first time to Ottawa, by driving "from Toronto to Ottawa in the middle of a snowstorm to give a surprise visit with his family" for her first anniversary. A57.

His commitment to his family often required much more time and effort. As his brother in law Uthayakumaran Nadarajah explains, Peter watched over his wife and three children when he was required to work in Montreal for three years and then encouraged him to follow his life long dream to open a restaurant in Ontario and make it a success. But as Uthayakuman writes

> This help is all nothing compared to what he did for my family back in 2007.   My oldest son A        was diagnosed with                  at the age of one.   Words  cannot describe what we all went through during that time.   We were in and out of the hospital pretty much every day; in other words, we literally lived at the hospital for more than six months.   On those days, Piratheepan was there, taking care of my son, as I could not leave my job and make frequent trips from Montreal.   He took my son to Sick Kid's Hospital early mornings and nights and spent the whole day with him.  I'm not ashamed to say that he was there for my son and fulfilled all the fatherly duties when I could not make it to appointments and surgeries.   Words cannot

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                  **06 Cr. 615 (RJD)**

> describe how much he had helped us throughout those dark
> years.  A59-60.

In his older brother Wickneswaran Nadarajah's letter, Peter's dedication and responsibility to his family is clear.

> Piratheepan is also a very filial son and brother.  He never stops
> sending money home every month for my parents when they
> were in Sri Lanka and now for my sibling's families.  When I
> fell in love with my wife, I was hesitant to get married thinking I
> won't be able to take care of my parents and siblings.   He made
> a habit to pitch in money to send my parents to our back home to
> see our siblings and their families every other year.   There was a
> time when I was given lay off and he was determined that he
> will take the full responsibility to send our parents home that
> year.  He was also willing to take care of some of my bills until I
> found a steady job.   A54.

Though he been unable to travel to Sri Lanka since his arrest in 2006, he has done what he could to help his nieces and nephews there. His kindness and devotion is not limited to his own family. Peter has known his wife's family for many years as they were also refugees from Sri Lanka. The letters of his sister in law, Jesintha Jeganathan, and that of his 14 year old niece J        M attest to Peter's caring and generous nature. Peter has often provided encouragement and advice to family and friends or to step up as a father figure when his nieces or nephews lost their father. A69, A65, respectively. *See* also A61-64, letters from his wife, Jenitha's family.

**Continued Service and Education During His Incarceration**

Your Honor has recognized the extraordinary efforts that some of the defendants have made while incarcerated in the MDC. While there are a number of educated young men who have been incarcerated in the MDC, only a few, such as Peter, Suresh and Thavarajah, have been so involved in the GED tutoring program and received letters of gratitude from fellow inmates. A163-170 *See* PSR ¶ 93. Peter is proud to have helped so many fellow inmates to begin their efforts to

32

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                    **06 Cr. 615 (RJD)**

become productive members of their communities. In seeking to make constructive use of his time while incarcerated, Peter has also completed many correspondence courses. A171-200. [19]

**Efforts Towards Reconciliation**

The defeat of the LTTE military occurred in May 2009. Humanitarian concerns for the Tamils living in the former LTTE controlled territory continued after the defeat. Eventually, a few LTTE supporters and other Tamils sought to assist in the reconciliation between the GOSL and the Tamils in Sri Lanka and the large expatriate community, including a very substantial one in Canada. Tamils supporting reconciliation faced great difficulty and suffered ostracism and abuse at the hands of many Tamils and Tamil groups. Notwithstanding these difficulties and abuse, Peter became a leading advocate for reconciliation between the Sri Lankan Tamils and the GOSL and the Sinhalese people.

There are a number of ways to work towards reconciliation - direct assistance to the Tamils in Sri Lanka devastated by the civil war, organizing and held fund economic opportunities for those trying to rebuild their lives in Sri Lanka, and building trust and common ground between the Tamil diaspora with the GOSL representatives and the Sri Lanka Sinhalese. Peter has been active in all of these since 2010. It has not been easy to overcome the bitterness of many Tamils and the continued opposition of many Tamils and Tamil organizations.

One of the larger commitments Peter has made in recent years was made possible by the end of the civil war. Under the umbrella of The Sri Gurumandalam Trust of Canada (SGTC), Peter was a founder of "Helping Hands," a community based program raising funds for those in need in Sri Lanka. See A84-88  Letters from Arun Ganeshan of SGTC, Father J. Francis Xavier, Mithili Murugesu.

I have attached photographs of the first meeting of Helping Hands that include some of the supporters including Father Xavier, the Sri Lanka Counsel

---

[19] The one disciplinary sanction occurred shortly after his arrival at the MDC when he was asked by a fellow inmate to help him put money into his telephone account and Peter asked his wife to do so. This assistance is not permitted.

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                               **06 Cr. 615 (RJD)**

General in Toronto, Karunarathna Paranawithana[20], and Ranjithan Camalalingam, Peter's brother in law. See A90, A97.  Because of Peter's pending charges, as a founder, he remained in the background allowing his brother in law and others to be the more public face of Helping Hands.  *See* A93-94. (Photographs with Peter, Jenitha and his mother in the background having helped to set up and photograph of Father Xavier, the Counsel General and Peter. A97.

Among the Helping Hands projects was raising funds for an orphanage run by the North-East Rehabilitation & Development Organization ("NERDO"). As Kumaran Pathmanathan of NERDO [21] notes "[i]t was the hard work and leadership acumen of Piratheepan that brought [NERDO] to the forefront" that helped achieve the mandate of  NERDO. A89.  Helping Hands brought clothing, shoes and umbrellas to the children of a NERDO orphanage. *See* A95-96, photographs of Peter's mother, sister Suba, her son, her husband, Ranjithan and A91-92, photographs of the orphans. Peter raised money for other projects in Sri Lanka for NERDO and for Doctors Without Borders, including funding Tamil Canadian eye surgeons trips to Sri Lanka.

Another means of reconciliation was to integrate the GOSL and its representatives into expatriate Tamil events. Deepavali is an important Hindu holiday celebrated by the Tamil communities in Canada. Because of the nature of the holiday and the decades of conflict between the Sinhalese dominated GOSL and the Tamil people, there has never been a Deepavali celebration with any

---

[20] The Sri Lanka Counsel General has been an advocate for reconciliation. I have attached an article, A99-101 which also can be found at http://www.sagennext.com/2011/09/16/my-role-is-to-unite-the-sinhalese-and-the-tamils-karunarathna-paranawithana-sri-lankan-consul-general-in-toronto/

[21] Mr. Pathmanthan is also know as "KP."  He was the leader of LTTE's foreign affairs office and claimed leadership of LTTE after the military defeat. After being returned to the Sri Lanka, he renounced the war and called for the reconciliation with the GOSL and founded NERDO, seeking the support of Sril Lankan Tamils at home at abroad.

34

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**    *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                           **06 Cr. 615 (RJD)**

participation nor acknowledgment by the GOSL in Canada.[22] With substantial opposition from parts of the Canadian Tamil community, Peter begun the process to change this.

With the cooperation of the Consul General on behalf of the GOSL, the GOSL was an active participant in the Deepavali festival starting in 2010 and continuing thereafter. *See* A111 November 10, 2011 Letter from the Consul General to Peter Nadarajah, Member of Organizing Committee.  Elements of the Canadian Tamil community opposed any GOSL involvement and sought to boycott and disrupt the events. A120-125.  Peter continued to organize these celebrations in 2011 and 2012.  Guests to the Deepavali events included the Sri Lankan Ambassador to Canada, Members of the Canadian Parliament, Sinhalese members of the Sri Lankan Parliament and religious leaders of all faiths. *See* photographs A116-118.  As noted in articles relating to the 2010 and 2011 events "[t]he significance of this year's events was the of large numbers from the Tamil community despite repeated requests by the pro-LTTE participation sponsored by the GOSL.[23]  A119, A122. Some in the Tamil community also disapproved of the

---

[22] Deepawali is called the "Festival of Lights" and is celebrated to honor Rama-chandra, the seventh avatar (incarnation of the god Vishnu). It is believed that on this day Rama returned to his people after 14 years of exile during which he fought and won a battle against the demons and the demon king, Ravana. (The Sinhalese King). People lit their houses to celebrate his victory over evil (light over darkness). The date of the celebration on the Gregorian calendar change every year. In 2010 it was November 5.

[23] In  2012, a Tamil Hindu priest participated in the celebration, a first, for no Tamil priest previously participated in any event with the Consul General in Canada. A128.

Because of Peter's case in the United States and his efforts to avoid extradition, Peter tried to stay in the background.  The emails from the Consul General and his general letter of recommendation provide some recognition of his efforts as well as documents received by your Honor directly.  An article relating to opposition from some of the Tamil community, http://www.torontoslcg.org/CG/deepavali-celebrated-in-canada-amidst-attempts-to-disrupt-the-event.html

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                **06 Cr. 615 (RJD)**

first invitation to a member of the GOSL, the Counsel General,  to the religious ceremony at the Thai Pongal festival in 2011. A129.

Peter did much more to bring the Sinhalese and Tamil communities together.  Peter secured a sponsorship from Rogers Wireless for a musical featuring Sinhalese artists performing Tamil songs.  The concert was successful and the both the Tamil and Sinhalese communities and the representatives of the GOSL  looked to him for more ideas. As a result, Peter worked with the Consul General to produce a Sinhalese/Tamil Food Festival, focusing on cross cultural foods, as both cuisines had a common heritage. This was likely the first time both communities came together under one event in Canada.

Peter also helped to coordinate the invitation to the Sinhalese community to attend services at Tamil temples and organized a Tamil Mass for the visit to Canada by the Sri Lankan Cardinal attended by members of the Tamil community. A127 (Father Xavier with the Cardinal.)   He held leader/ media conferences in temples, to promote cross-cultural unity. *See e.g.* A128, Muslim Imam, Father Xavier, the Consul General and a Hindu priest at consulate.

In 2011, with the assistance of Peter, the Tamil community joined in the GOSL Sri Lankan Independence Day celebration for the first time.  *See* A130, Invitation to Independence Ceremony noting cultural events of Sinhala, Tamil, Muslim and Malay communities and ceremony was conducted in Sinhala, Tamil and English A114- A115.   Of great significance

*See also* A132, photograph of a Sinhalese Member of Parliament from Sri Lanka, Father Xavier, the Consul General and Peter.

Coming from a family of entrepreneurs and having advised friends starting businesses, Peter also provided guidance and support to Canadian entrepreneurs to travel to the Tamil areas of Sri Lanka to develop wineries. He brokered an agreement with the Sri Lankan Government to rent 1000 acres that created need employment for the unemployed in the Tamil areas.

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                              **06 Cr. 615 (RJD)**

As a result of Peter's efforts towards the reconciliation of Tamils and the GOSL and Sinhalese majority,

24

### The Need for Peter's Return To Care for His Son and His Family

The PSR at ¶ 92 explains some of the difficulties faced by Peter's son, wife and their elderly parents.  The letters of Jenitha, her mother, Kanagambigai Jeganathan and Peter's mother, Nagammai Nadarajah, explain the difficult and disintegrating conditions of the family over the past year. A47, A52, A52.  While Peter and Jenitha's son,                          is able to "essentially" function as a normal child with his disease, the burden to monitor and control J activities is difficult and stressful and is reaching a critical point. Both sets of grandparents have done as much as they could but are limited by the medical conditions, financial conditions and for Peter's parents, their difficulty in English. Indeed, they have often relied on Peter and Jenitha's assistance for their daily needs, whether it be shopping or visits to the doctor offices. The responsibility and pressure now sits on the shoulders of Jenitha alone, something that she was not prepared for.

> I cannot do it [care for their son] alone without my husband. I
> was very dependant on him. I never left home before marriage. I
> went to the university right across the street from my house.

---

24

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**    *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                            **06 Cr. 615 (RJD)**

 Now I am forced to do things on my own and take care of my son who needs help. I feel guilty whenever there is a health issue with my son since I feel I am neglecting him. A48.

When Peter was extradited, they were living with Peter's parents. As her mother in law, Nagammai Nadarajah explains as a result an injury from a fall

I have difficulty carrying out even basic everyday activities, such as grocery shopping.  As a result, Piratheepan has been taking care of all our basic household needs. He has always been the backbone of our family, and his sudden absence in the family has not only emotionally affected us, but has also stripped us of all the support he had provided. We feel that our lifespan has been significantly reduced without his presence. We are not sure how much longer we can survive without him around. A50.

Because of the physical needs of Peter's parents and the financial toll of the prosecution, especially the loss of income from Peter during the last year, Jenitha and J    have been forced to move out from her in law's home and in with her parents who live on disability payments and in subsidized housing.

After he was extradited, we were unable to take care of Piratheepan's wife and son who require constant care and medical attention. We hated to see his son end up in the hospital over his severe kidney and other medical complications. We feel helpless since we were not able to assist them without physical strength or English knowledge, among other challenges. Therefore, we have asked our daughter-in-law and grandson to move out to live with her parents. This is not because we don't love them. It is the opposite reason. We wanted them to have someone who can provide proper attention to them. However, even in her parents' place, the situation is not great since both of her parents have medical complications as well, although they are slightly younger than my husband and me. A50.

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**  *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                      **06 Cr. 615 (RJD)**

This is a precarious situation, not simply because of finances but because of the medical conditions of Jenitha's parents. As Mrs. Jeganathan says "[i]t is hard to take care of our grandson due to our medical condition, but we are suffering to take care of him till our son in law comes home soon.... We hope he can return to avoid further degradation of the health of the entire family." A53.

As so many letters note, all are fearful not only of J    physical well-being but also for his emotional and psychological needs. Jenitha and J    were able to visit Peter shortly after his extradition but only for a non contact visit. As Peter explains

> One moment keeps haunting me over and over. My son J
> accompanied my wife on her only visit.  Because of the type of
> charges we were granted non-contact visit. When my wife gave
> my son the phone to talk to me, he tore himself away from my
> wife, crying and screaming, "Why daddy does not want to hold
> me". My son did not speak to me ever over the phone for almost
> a year after. A46.

Since that visit Jenitha and J    have been refused entry into the United States Department of Homeland Security. We are unable to get an answer why, but I assume it is the result of the use of a bank account without her knowledge on a few occasions in the purchase of the night vision goggles.[25] Being unable to visit his father and moving into different households has left J    with the feeling of abandonment. Jenitha has great fear of the impact on their son.

> When speaking on the phone, he [J    ] cries afterwards that his
> father has abandoned him. He feels that everyone around him
> has abandoned him. We were living with my husband's family
> and recently moved with my parents. He felt that everyone in my
> husband's family abandoned us since we had to move. Now at
> my parents' house, my elder sister was living there with her 2

---

[25] Sahil, worked at TD Bank, handled Peter and Jenitha's personal accounts and had access to the accounts.

LAW OFFICE OF SAM A. SCHMIDT

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                                  **06 Cr. 615 (RJD)**

> children. They also recently moved out to live on their own. J
> felt heartbroken that they also don't like him and abandoned him.
> He feels his father has abandoned him, along with the rest of the
> family. A48.

The stress and pressures are taking a toll on Jenitha.  She as suffered depression, and has lost her concentration while driving resulting in accidents, fortunately, not serious ones. A49.  His wife, his son and their parents do need Peter.

**The Automatic Application of the Guidelines' Terrorism Enhancement Should Be Remedied By Resort to the §3553(a) Sentencing Factors and Departure Law[26]**

Before I discuss how the other sentencing factors found in 3553(a) impact on your Honor's determination of the appropriate sentence for Peter Nadarajah, a brief discussion of the impact of U.S.S.G §3A1.4 is necessary.  It is not disputed that §3A1.4 is applicable in Peter's Guidelines calculations.  Without this section, Peter's Guideline range would likely be 57-71 months.[27] With this section, the Guidelines are 360 months.  Fortunately, Peter is being sentenced in 2014, not during the pre-*Apprendi* and *Booker* era.  Now, the parsimony clause and sentencing factors found in §3553(a), are a counterpoint to the drastic impact of §3A1.4.

---

[26] Your Honor is familiar with most of what appears in this section since it is the result of of Joshua Dratel's efforts and his generosity in permitting me to include his work in my submission.

[27] In addition the offense level was increased by two levels because of § 2M5.3(b)(1)(A) that a coconspirator sought to provide a dangerous weapon. This adjustment does not require Peter's knowledge that a coconspirator, and not necessarily one named,  who would be seeking dangerous weapons but only that one did. Moreover, Peter acknowledges that once you involve yourself with those seeking to give material support to the LTTE, that some coconspirator in the such a conspiracy would be seeking either weapons or money that would be used for many things, including weapons or supplies used in "violent" acts.  Without this adjustment, Peter's guidelines would be 46-57 months.

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**  *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                    **06 Cr. 615 (RJD)**

The Second Circuit made it clear that when dealing with automatic and severe  Guidelines enhancements that placed Guidelines ranges at or near the statutory maximum(s), as it did in a child pornography case and does in the instant case, that "the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what §3553 requires." *United States v. Dorvee* 616 F.3d 174, 184 (2d Cir. 2010). *See also United States v. Bonilla*, 618 F.3d 102, at 110 (2d Cir. 2010) (extending *Dorvee* doctrine to the 16-point enhancement related to illegal reentry conviction)*;  United States v. Tutty*, 612 F.3d 128, 130-33 (2d Cir. 2010) (applying *Dorvee*).

When  enhancements are not based on empirical data, a sentencing court owes even less  deference to that particular Guidelines. *See e.g.*  Kimbrough,  552 U.S. 85 (crack vs. cocaine); *Dorvee*  616 F.3d at 186 (child pornography);  *United States v. Pahua-Martinez*, 2009 WL 2003241 (D. Neb. 2009) (immigration guidelines).[28]  Specific problems with such enhancements include, for example

> [a]n ordinary first-time offender is therefore likely to qualify for
> a sentence of at least 168 to 210 months, rapidly approaching the
> statutory maximum, based solely on sentencing enhancements
> that are all but inherent to the crime of conviction.

*Dorvee*, 616 F.3d at 186.  Adherence to the Guidelines results virtually no distinction between the sentences for defendants like *Dorvee*, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories. 616 F.3d at 187.

---

[28] *See Sentencing Opinion and Statement of Reasons Pursuant to 18 U.S.C. § 3553(c) Explaining a Policy Disagreement with the Methamphetamine Guidelines, United States v. Hayes*,  --- F.Supp.2d ----2013 WL 2468038, by Judge Bennett, ND Iowa. (Judge Bennett found that the methamphetamine Guidelines were entitled to less deference than Guidelines that were empirically grounded. *Hayes* at 32.)

41

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                   **06 Cr. 615 (RJD)**

Confronted with this, the Court found that  "[t]his result is fundamentally incompatible with § 3553(a)[,]" because "[b]y concentrating all offenders at or near the statutory maximum, §2G2.2 eviscerates the fundamental statutory requirement in §3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant[.]'" *Id.*   In language particularly relevant here with respect to Peter, the Court in *Dorvee* added that mechanical application of such Guidelines enhancements violates the principle, reinforced in *Gall*, that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct.  See *Gall*, 552 U.S. at 55  (affirming a sentence where "it is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted similarities among other co-conspirators who were not similarly situated." *Id*.13.   Ultimately, the Court in *Dorvee* reminded that [d]istrict judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under §2G2.2 - ones that can range from non-custodial sentences to the statutory maximum-bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results.   616 F.3d at 188.

As the Second Circuit recognized last week in *Pratheepan*, that "broad discretion" exists in all cases, be it a child pornography case or a "terrorism" case. In *Dorvee*, the Court stated "[w]hile we recognize that enforcing federal prohibitions on child pornography is of the utmost importance, it would be manifestly unjust to let Dorvee's sentence stand." *Id.* In *Pratheepan*, the 2d Circuit recognized the competing consideration in an LTTE case, including that it was appropriate to consider that the motivation of the actor, was not for "power" or "self-aggrandizement" but for "a desire to help the Tamil people ... in an ongoing civil war, one with serious human rights violation on both sides of the conflict." *Pratheepan* at 12. The Circuit also recognized the appropriateness of your Honor's consideration that Thavaraja had no intent to cause harm to the United States. *Id.* at 18.

42

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                    **06 Cr. 615 (RJD)**

Here, the same is true with respect to applying §3A1.4 to Peter notwithstanding the importance of counterterrorism policy and practice. Similar to *Dorvee*, "adherence to the Guidelines results in virtually no distinction between sentences for the most dangerous offenders," and someone like Peter who did not commit any violent acts, and has not committed any offenses in the past and there is no threat of recidivism.  616 F.3d at 187.

**Increasing Peter's Criminal History Category From Category I
to Category VI Grossly Overstates His Criminal History.**

Notwithstanding application of the enhancement in §3A1.4 to Peter, the Court should depart downward a significant amount, and/or impose a non-Guidelines sentence substantially below the Guidelines range, because the prong of the enhancement that assigns Peter to Criminal History Category VI, §3A1.4(b),  constitutes a gross overstatement of his criminal history, which otherwise would be Category I (lacking any prior criminal history, and therefore having zero criminal history points).   The enhancement undermines the structure of the Guidelines, and the role and purpose of the Criminal History Category in maintaining individualized sentencing determinations.   As a result, the Court should correct the inequity created by §3A1.4(b) with a substantial "horizontal" downward departure with respect to Peter's Criminal History Category.  As the Guidelines instruct, the Court may depart downward if:

> reliable information indicates that the defendant's criminal
> history category substantially over-represents the seriousness of
> the defendant's criminal history or the likelihood that the
> defendant will commit other crimes[.]

USSG § 4A1.3(b)(1).   In addition, even without a formal departure on that ground, the distortion created by §3A1.4(b) provides further compelling justification for a non-Guidelines sentence, dramatically below the Guidelines range, based on the factors set forth in 18 U.S.C. §3553(a).

As one District Court has recognized, "[a]fter applying § 3A1.4, Defendant's criminal history is maximized at category VI.  For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                                         **06 Cr. 615 (RJD)**

of the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history." *United States v. Benkahla*, 501 F.Supp.2d 748, 759 (E.D.VA 2007) (granting a departure pursuant to USSG §4A1.3, and reducing the defendant's criminal history category from VI to I) (affirmed, 530 F.3d 300 (4th Cir. 2008).

Encouraging flexibility in addressing the impact of §3A1.4 on a defendant's Criminal History, the Second Circuit has instructed that "[a] judge determining that §3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under §4A1.3 to depart  downward in sentencing." *United States v. Meskini*, 319 F. 3d 88, 92 (2d Cir. 2003).

Here, the balance between the offense and the offender would be irremediably disrupted by reflexive placement of Peter in Criminal History Category VI.  In addition to ignoring the mandate of §3553(a)(1), and overstating Peter's Criminal History score as much as possible under the Guidelines (from zero to the maximum), the enhancement precludes any retention of individualized sentencing of Peter because it effectively removes from advisory Guidelines consideration the only axis that integrates a defendant's background and  history into the advisory Guidelines equation.

Because the exclusion of consideration of the defendant's background and history in the ordinary advisory Guidelines calculation is typically offset by the Criminal History score, it is respectfully submitted that here the imbalance created by assigning Peter to Criminal History Category VI can be rectified only by a substantial "horizontal" downward departure. See, e.g., *Czernicki v. United States*, 270 F. Supp.2d 391, 393 (S.D.N.Y. 2003) (downward departure granted upon a finding that the Criminal History Category had overstated the defendant's criminal history).

In the alternative, the automatic placement of Peter in Category VI should be remedied by a non-Guidelines sentence of "time served," which accounts for the other §3553(a) factors that greatly outweigh the arbitrary application of the absolute and extreme horizontal Guidelines enhancement applied via §3A1.4(b).

44

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                                          **06 Cr. 615 (RJD)**

*See also* United States Sentencing Commission March 2006 Final Report on the Impact of *United States v. Booker* on Federal Sentencing, at 78 (excessive Criminal History Category constitutes one of the four most common reasons post-Booker for non-Guidelines sentences imposed below the calculated range).

The Government's argument opposing this will likely be the same as its arguments in two of the more recent cases. In its September 26, 2012 submission in *United States v. Suresh Srikanarajah* the Government opposed this departure because "[t]here is no information in the record indicating that placing the defendant in Criminal History Category VI over-represents his criminal history or likelihood of recidivism. At page 24 of its submission in *United States v. Thavaraja,* the Government stated that this court's downward departure 'effectively negated' the Guidelines' upward adjustment for terrorism offenses and understated the potential dangerousness of Thavaraja, who remains committed to the LTTE cause, and therefore will pose a direct threat to Sri Lankans and Indians upon his release from incarceration." It also argued that Thavaraja and his co-conspirators "dedicated years of their lives to supporting the terrorist activities of the LTTE. Criminal History VI thus appropriately reflects their long-term criminal activity in support of a violent terrorist organization."

This argument was also rejected by the Second Circuit in *Pratheepan*. It also has no relevance here for unlike Suresh, Thavaraja or the other defendants in this and the related case, Peter was not a dedicated supporter of LTTE and his assistance covered a period of approximately 8 months. As your Honor has previously expressed in the related case and endorsed by the Court of Appeals in *Thavaraja*, this case and this defendant are very different from the normal case that "carries the banner of terrorism."

Accordingly, the effect of the terrorism enhancement, §3A1.4, should be neutralized, both vertically (regarding his offense level) and/or horizontally (regarding his Criminal History Category), through consideration of the §3553(a) factors consistent with the principles and concerns expressed in *Dorvee* and most recently, in *Thavaraja*.

45

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                          **06 Cr. 615 (RJD)**

**The Need to Avoid Unwarranted Disparities**

The Government has acknowledged that when considering a proportionality argument one does not necessarily rely on the sentences of those charged in the same Indictment. The Government argued the sentences that should be considered for a proportionality argument should be sentences of those whose conduct was similar. That point is well taken.  For Pratheepan Thavarajah, the Government argued that his sentence should be more similar to those in this case, not with those defendants in his own indictment as a result of the similarity of conduct.

While there are many disparities between Peter and those charged under the instant indictment and the related indictment, Peter's offense conduct, the conduct he admitted and the only conduct where there is any proof, i.e. helping others to obtain night vision goggles for the LTTE and obtaining cell phones for a few of its supporters, is much different than his codefendants and more similar, to that charged under the related case. Thus, the PSR's recommendation that Peter Nadarajah's sentence be "commensurate with others imposed in this case,"  a proportionality argument that, as the Government may agree, should be disregarded because the codefendants' conduct was quite different.

Thavaraja received a sentence of 108 months and was described as the principal weapons procurement officer having obtained over twenty million dollars of weapons for the LTTE. Sentencing transcript p.5, 34.[29] Under no circumstance could Peter's conduct ever be comparable to that of Thavaraja. Though there are many similarities between Peter and Suresh Srikandarajah (Suresh")  relating to their post 2006 arrest conduct in support of reconciliation

---

[29] At his sentencing your Honor said

I stand by my reservations about his role, but his function certainly was critical and involved, by his own admission, procurement of deadly merchandise, almost inevitably used to injure, murder, maim, not only military but civilians.   It was inevitable.

46

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie** *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                               **06 Cr. 615 (RJD)**

and achievements, there are many dissimilarities in the prearrest conduct including the duration and nature of the offense conduct.

Suresh was a longstanding LTTE supporter, raising money, laundering the money, purchasing or attempting to purchase arms, designs for warships and submarines as well as numerous other electronics, computer and communication equipment. The only reason his Guideline range was less was that he was charged with only one count of Material Support with a maximum sentence of 180 months, thereby reducing his Guideline range from 360 months to life to 180 months. He was sentenced to 24 months.  Because of the anvil of a minimum of 25 years dangling above his head, the plea offer for Peter required guilty pleas to two counts, the conspiracy count and an attempt count. Thus his range was changed from 360 months to life to simply 360 months. Such an artificial distinction should not create an unwarranted sentencing disparity nor should it have an effect on your Honor's determination of the appropriate sentence. Based upon the differences of the duration and nature of the material support, a sentence below that received by Suresh would be an appropriate disparity. One greater than Suresh would be an unfair and unwarranted disparity.

**The Need for Adequate Deterrence, the Protection of the Public and Provide Just Punishment**.

There should be no doubt that Peter needs no additional incarceration to deter future criminal conduct nor to protect the public. If his first thirty (30) years of his life did not prove this, certainly his last seven (7) years have.

The punishment and suffering Peter has endured during the last seven and one half years has not been limited to the time he has spent jail. The six and one half years of home detention have also taken a toll.  In addition to the more than thirteen (13) months that he has been incarcerated in the United States after his extradition, Peter was incarcerated for 73  days in Canada between his arrest and extradition.[30]  During the period he was released on bail he was under home

---

[30] Not unlike many prisons in the United States, the Toronto detention centers were overcrowded. Unlike most prisons, however, because he was often considered a

47

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                 **06 Cr. 615 (RJD)**

detention that allowed him to work and participate in community service but for much of the time he was required to be accompanied by a surety whenever he traveled. As the case reached the higher courts, the conditions were modified to require the presence of an adult in the home whenever he was present. As a result, Jenitha was unable to return to her teaching position after her maternity leave. Only after Peter's parents returned to Canada was she able to obtain another job, this time as a teacher's assistant at a substantially lower salary.

Of course, Peter and his family lived with the uncertainty, fear, anxiety and stress, not knowing what will happen to him or his family.[31]  This had emotional, psychological, physical and financial repercussions to Peter and his family. Additionally, the bureaucratic decision apparently made by the Department of Homeland Security, preventing visits by his wife and child has also resulted in great anguish and pain for Peter and his family. And, should Peter's incarceration continue, so undoubtedly will the inability of his wife and son to visit him.

It is difficult to better express why a sentence of 16 months, time served, satisfies these factors, including providing just punishment, than quoting your Honor at Thavaraja's sentence. This is a thoughtful and accurate description of the conduct of these young men and was duly cited by the Circuit.

> I say unusual because it carries a banner of terrorism and yet
> involves people who certainly pose no direct threat to the United
> States, and indeed many of them have embraced citizenship here

---

"temporary" inmate, Peter was often required to sleep on the floor. Prior to an amendment in 2010, Canadian courts often credited defendants with multiples for each day in difficult conditions of confinement. *R. v. Burke* [2003] O.J. No. 4849 -- 3:1 for deplorable conditions included triple bunking and sleeping on the floor; *R. v. Smith*[2003] O.J. No. 1782, -- 3:1 largely due to 30% over-crowding at the Toronto Jail; *R. v. Jabbour* [2001] O.J. No. 3820, 2001 OSCJ - just over 2:1 credit for periods of pre-trial custody where they were triple bunked.

[31] While the Government may argue that the years of anxiety and stress were the result of his decision to fight extradition, it was still a severe restriction of his freedom for six and one half years.  *See also* pp 51-52, *infra*.

48

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                   **06 Cr. 615 (RJD)**

and are granted refuge.   Most are educated.   We don't justify the ends with this kind of means.   Indeed, these folks, although they pose no direct threat, face severe sanctions here in the United States because we don't in any way underwrite or care to underwrite terrorist activities anywhere in the world.

That said, I have little doubt that most, and certainly including this defendant, who does indeed stand apart, I quite agree, is motivated primarily not for power, self-aggrandizement, but in an effort to help the Tamil people.   It's beyond me to make sense of the situation in Sri Lanka certainly before the defeat of the LTTE, people against people, tragedy, death, destruction, apparently on both sides and to hear in an American court we find our responsibility is to impose some judgment on people who are engaged in elicit activities in an effort to help people who were, at least in their view, being persecuted by other authorities.

        ...

Interestingly, while at MDC he has been apparently a very model, positive inmate.   It's not often I get letters from other inmates thanking this defendant or any defendant, for that matter, for the assistance that had been given them.   Very unusual, indeed.

Thavaraja sentencing transcript at 36-38.

### Death of Peter's Brother Jegan in Sri Lanka

Perhaps the greatest punishment suffered by Peter is his belief that it was his involvement with the co-defendants that caused the death of his brother Jagen in August 2006. On June, 25th 2006, Peter's parents visited Colombo City,  Sri Lanka, to visit the families of Jagen and their other child that remained in Sri Lanka.  On August 3, 2006, Jagen and his family accompanied by his parents

49

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                    **06 Cr. 615 (RJD)**

drove to city of Jaffna to attend the Temple Festival.[32]  On August 6, 2006, the GOSL sought to isolate the LTTE territory and shutdown the only means of direct land travel between Colombo and Jaffna, the 'A9' highway.  In retaliation the LTTE banned the travel by any other means, airplane or ferry.

It is common knowledge that such situations are typically temporary, and is used to assert political power and control. As a result, the family decided to stay in Jaffna to await the resolution of the situation. On August 23, 2006 Peter was arrested. Initially it was believed that Peter would be released quickly.  When they learned that he would not be released immediately and that Peter was attempted to liquidate his own assets, including he beloved motorcycle, Jagen decided he needed to travel to Canada to help. Jagen decided to take the risk of leaving Sri Lanka and sought the help of a friend who was in the GOSL military which was then  operating the ferry from Jaffna. Jegan left the family early in the morning on September 9, 2006 and was on line to purchase tickets at 4 AM. There was an attack and four people were killed, including Jegan. The GOSL and the LTTE blamed each other for the cause of the shooting but it believed by neutral parties that the LTTE was responsible. *See* A259-260.

Had Peter not involved himself with the codefendants and not been arrested, Jegan would not have sought to risk leaving Jaffna. He would be alive today. Peter carries this guilt and sorrow with him thinking, "every time I visit my brother's kids, I will stand in the corner waiting in fear for when one of them will finally scream, "MY DAD DIED BECAUSE OF YOU". Whenever I hold my mother, I wonder what does she feel, would she wish that it was me." A46.

**The Need to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.**

Clearly, there is no need for any of these services for Peter.

---

[32] The cities Colombo and Jaffna were controlled by GOSL. T get to or from Jaffna to or from Colombo required travel through LTTE territory.

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                    **06 Cr. 615 (RJD)**

**Sentences Available**

The available sentences range from time served, approximately 16 months to 30 years.

**The Government's Failure to Modify Its Record of the Case for Extradition and Untimely Production of *Brady* Material.**

Waiting until January 9, 2014 to provide the extremely favorable admission that it cannot prove even by a preponderance of the evidence that Peter was a technical expert and the fully exculpatory statements by Thani in his October 2009 post plea proffer was not only a *Brady* violation in this court but was a violation of the Extradition treaty between the United States and Canada and caused a violation of the *Extradition Act* of Canada. *See United States v. Tarantino*, 2003 BCSC 1134 (2003), attached for your Honor's convenience. A6-18. First, since "the record of the is the primary method for introducing evidence" and "is afforded a broad and powerful presumption of accuracy founded upon the act of certification by a responsible official in the requesting state "Canada relies on 'the fairness and good faith' of the requesting state." A14. The court noted that

> "[c]ertification of the record of the case, impacting as it does on the liberty of a Canadian citizen, is not intended to be the perfunctory, pro forma, expedient exercise as it appears to have been here."

> Where the conduct of a foreign certifying authority falls so far below an expected reasonable standard to amount to a complete failure of due diligence, this impacts on the fairness of the extradition process, due to the quality of the material placed before this court, and on the ability of this court to preserve the integrity of the process. A15.

The second violation related to the exercise of the Minister of Justice's exercise of discretion. In upholding the Minister of Justice's discretion to extradite in this case, the Supreme Court of Canada noted that the decision to extradite "is a complex matter" and that his discretion was not unfettered and set

51

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**    *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                        **06 Cr. 615 (RJD)**

forth twelve (12) factors that needed to be balanced, most of which would have been impacted by whether Peter was the "armaments" or "technical" expert. *See* A25-27.

The Supreme Court noted that the decision to extradite was required to be in good faith and that "concerns that the decision may have been based on out-dated information" was satisfied by appellants ability to provide correct and full information to the Minister. A28. Unfortunately, this could not be done in the instant case because the Government did not inform either Peter or the Canadian government of its inability to prove by a preponderance of evidence that Peter was a technical expert until January 9, 2014. The extradition treaty between he United States and Canada make it very clear that

> The determination that extradition should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use all remedies and recourses provided by such law.

Treaty on Extradition Between the Government of Canada and the Government of the United States of America Article 8.[33] This remedies and recourses would include access to all *Brady* material.

As the Court in *Tarantino* so aptly noted

> Certification is the mechanism which the Extradition Act provides to satisfy the court as to the foundation issue, whether there is evidence available in the requesting state. While sending a Canadian citizen to a foreign state through a streamlined presumptive process does not violate the Charter, nor constitute an abuse of process, a violation occurs where it is concluded that the diligence of the requesting state is not of a standard which justifies the granting of the presumption. A

---

[33] http://www.oas.org/juridico/mla/en/traites/en_traites_can-usa-ext1991.pdf

52

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                         **06 Cr. 615 (RJD)**

statutory shortcut that impacts on the liberty of a citizen and may result in extradition to a foreign country requires a careful, considerate approach by the foreign authority to the extraordinary powers granted them by the new Extradition Act. The court has the power to control its own process and should demand that the foreign certifying authority be diligent and accurate. Conduct of foreign officials seriously lacking in diligence and accuracy interferes with fundamental justice and protection of the liberties of Canadian citizens. A17.

## CONCLUSION

We see only a few people who enter our criminal justice system who have earned the respect of family, friends and their community for the example they set in living his or her life. Such are people who have generally lived up to a high standard of integrity, generosity, responsibility and trust only to making errors in judgment that have the potential not only to destroy their own life but of others as well. The reasons to grant a more lenient sentence to such a person is usually numerous. There is the good work that such person has done for his family and his community. There is the character of such person has shown that gives the court confidence that such aberrational conduct will never occur again. There often is the hardship that will result with further imprisonment. In this case, Peter's mother expresses that pain and hardship.

> At this age, I cannot bare the pain of losing another son. Piratheepan has always been a responsible child. He's never had any behavioural issues at home or school during his childhood and teenage years. He is always willing to help anyone in need and family has always been his priority. Please give me the opportunity to spend the last few years of my life in Piratheepan's care, instead of struggling to live each day. Please give my grandson the opportunity to have a normal childhood with his father by his side, and to share important moments in his life. Please give my daughter-in-law the opportunity to raise her child with her husband, instead of struggling for the rest of

53

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**    *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                                        **06 Cr. 615 (RJD)**

her life as a single mother. A51.

There is the sincerely and heart felt remorse from such a person that may be accompanied by enlightenment and sorrow. Peter explains

> I was told by a friend here that "pain is a blessing." At first I was shocked to hear such a statement. I think I now understand its true depth, that pains give one such clarity of one's self, that only comes with true suffering and the true acceptance of responsibility.

> Your Honor, how could my apology show this sorrow? Your Honor when I write to tell you how sorry I am, my words cannot carry the depth of my sorrow. I cry everyday. I beg God, to let me be there for my family.

> ...

> Remorse has been carved in the depth of my heart. All  I have left is to say sorry for this Your Honor, thank you for your patience, and I hope your forgiveness will be stepping stone for my family and my forgiveness to myself. A45.

No punishment can be worse than the punishment he feels as a result of his belief that it is he is the cause of the death of his brother. But Peter hopes and prays that his sentence will allow him to make up for his wrongful conduct and not cause anymore suffering to those he loves.

There is also the fact that Peter's conduct was not the result of greed, power or self-aggrandizement.  And there is one additional extraordinary reason for your Honor to show leniency towards Peter Nadarajah. It is not just his devotion and dedication to community service and helping those in need without seeking approval or recognition. It's not "never saying no" to a request for help. It is all of these efforts and personal characteristics associated with this good man and taking it to a new level - an international level, to help rebuild a country and people torn apart by decades of civil war. It is bringing religious leaders together. It is not just organizing a new charity, but being the one putting the chairs out, cleaning up and serving the food in the background and not being the person making speeches and

54

**LAW OFFICE OF SAM A. SCHMIDT**

**Sentencing Letter to Hon. Raymond J. Dearie**   *United States v. Piratheepan "Peter" Nadarajah*
**January 31, 2014**                              **06 Cr. 615 (RJD)**

being awarded recognition. It is, in fact, being the kind of person who is embarrassed when photographed with officials who have acknowledged his hard work.

Simply, what benefit is there by further incarcerating Peter Nadarajah? Simply, what benefits are there by allowing him to return to his community and his family? I submit to your Honor that the answers are indisputable. That is why I sincerely believe that a sentence of time served - equal to 16 months incarceration, years of home detention and remorse, is "sufficient but not greater than necessary" to achieve the purposes of sentencing.

Sincerely yours,

/s/

Sam A. Schmidt

cc: AUSA Alexander Solomon

55